**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Samuel Loring MORISON, Defendant–Appellant,**

**the Washington Post; CBS, Inc., et al., Amici Curiae.**

**No. 86–5008.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1987.

Decided April 1, 1988.

Rehearing and Rehearing In Banc Denied April 29, 1988.

---

Mark H. Lynch (Charles F.C. Ruff, Neil K. Roman, Steven F. Reich, Covington & Burling, Jacob A. Stein, Robert F. Muse, Stein, Mitchell & Mezines, Washington, D.C., on brief), for defendant-appellant.

Breckinridge Long Willcox, U.S. Atty., Baltimore, Md., for plaintiff-appellee.

(Daniel J. Popeo, Utica, N.Y., Paul D. Kamenar, Washington, D.C., Michael P. McDonald, Marianne M. Hall on brief), for amici curiae Washington Legal Foundation.

(Patti A. Goldman, Alan B. Morrison on brief), for amicus curiae Public Citizen.

(Kevin T. Baine, David E. Kendall, Victoria L. Radd, Williams & Connolly, Washington, D.C., on brief), for amici curiae The Washington Post, et al.

Before RUSSELL, PHILLIPS, and WILKINSON, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendant is appealing his conviction under four counts of an indictment for violation of 18 U.S.C. § 641, and of two provisions of the Espionage Act, 18 U.S.C. § 793(d) and (e). The violations of the Espionage Act involved the unauthorized transmittal of certain satellite secured photographs of Soviet naval preparations to "one not entitled to receive them" (count 1) and the obtaining of unauthorized possession of secret intelligence reports and the retaining of them without delivering them to "one entitled to receive" them (count 3). Counts 2 and 4 of the indictment charged violation of the theft provisions of 18 U.S. C. § 641. His defense was essentially that the statutes did not encompass the conduct charged against him and, if they did, the statutes were unconstitutional. At trial, he also found error in certain evidentiary rulings by the district judge. We find the claims of error unfounded and affirm the conviction.

### I.

### *Summary of the Facts*

The defendant was employed at the Naval Intelligence Support Center (NISC) at Suitland, Maryland from 1974 until October, 1984. At the time of the incidents involved in this prosecution, he was assigned as an amphibious and hospital ship and mine warfare analyst in the NISC and as such had been given a security clearance of "Top Secret–Sensitive Compartmented Information." His work place was in what was described as a "vaulted area," closed to all persons without a Top Secret Clearance.[1] In connection with his security clearance, he had signed a Non–Disclosure Agreement. In his Non–Disclosure Agreement, the defendant acknowledged that he had received "a security indoctrination concerning the nature and protection of Sensitive Compartmented Information, including the procedure to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have

been approved for access to it and I understand these procedures.... [that he had been] advised that direct or indirect unauthorized disclosure, unauthorized retention, or negligent handling of Sensitive Compartmented Information by me could cause irreparable injury to the United States or be used to advantage by a foreign nation.... [that he understood he was] obligated by law and regulation not to disclose any classified information in an unauthorized fashion.... [that he had been] advised that any unauthorized disclosure of Sensitive Compartmented Information by me may constitute violations of United States criminal laws, including the provisions of Section 793, 794, 798 and 952, Title 18, United States Code...."

For some time prior to the incidents with which this prosecution is concerned, the defendant had been doing certain off-duty work for *Jane's Fighting Ships*, an annual English publication which provided current information on naval operations internationally. Sometime before July, 1984, *Jane's*, which for many years had been publishing *Jane's*, had begun the publication of another periodical on a weekly basis. This new publication was called *Jane's Defence Weekly* and its editor-in-chief was Derek Wood, with an office in London. The defendant had been paid varying amounts for such services as rendered *Jane's* dependent on the value of the information he furnished. This arrangement with *Jane's* had been submitted to and approved by the Navy but subject to the defendant's agreement that he would not obtain and supply any classified information on the U.S. Navy or extract unclassified data on any subject and forward it to *Jane's*. The defendant's off-duty services with *Jane's* had become a subject of some controversy between him and the Navy. As a result, the defendant had become dissatisfied with his employment by the Navy and wished to secure full-time employment with *Jane's*. The defendant began a correspondence with Wood on the prospects for

---

**1.** Because of the secrecy imposed in such an area, "Secret" material could be left on the desk

of the employees while they were away.

full-time employment with the periodical. He requested an opportunity to interview Wood when the latter was in Washington next.

Wood visited Washington in June, 1984, and, by arrangement, saw the defendant in connection with the latter's request for employment. At that time, Wood discussed with the defendant a report which had appeared in the American press with regard to an explosion that had recently occurred at the Severomorsk Soviet Naval base. Wood expressed the interest of his publication in securing additional details since such an explosion was "a very serious matter." The defendant told Wood that the explosion "was a much larger subject than even they had thought and there was a lot more behind it." The defendant also said he could "provide more material on it" if *Jane's* were interested. Wood responded that he was interested in receiving additional material on the explosion and, if the defendant were able to provide such, he could use for transmission of such material to *Jane's* "the facsimile machine for direct transmission in our [*Jane's*] Washington editorial office." The defendant told Wood also that he could provide Wood with other material. While there was no direct statement about what compensation the defendant would receive if he sent material to Wood that was used the practice had been that when the defendant had in the past furnished material of interest *Jane's* had paid the defendant. When Wood returned to London a few days later, he received from the defendant "about three typed pages of material background on Severomorsk." A few days later, the defendant transmitted to Wood "two other items on further explosions that had occurred at the site on different dates and also a mention of one particular explosion in East Germany."

The activity of the defendant which led to this prosecution began on July 24, 1984, a few days after the interview of the defendant by Wood and after the defendant had sent Wood the material described in the preceding paragraph. At that time the defendant saw, on the desk of another employee in the vaulted area where he worked, certain glossy photographs depicting a Soviet aircraft carrier under construction in a Black Sea naval shipyard. The photographs, produced by a KH–11 reconnaissance satellite photographing machine, had been given this analyst so that he could analyze and determine the capabilities and capacities of the carrier under construction. The photographs were stamped "Secret" and also had a "Warning Notice: Intelligence Sources or Methods Involved" imprinted on the borders of the photographs. The defendant later in his confession said he had earlier sent an artist's sketch of a Soviet carrier under construction to *Jane's* and had been paid $200 for his services. When he saw the photographs, the defendant recognized them as satellite photographs of the Soviet ship, taken by a secret method utilized by the Navy in its intelligence operations. Unobserved, he picked the photographs up, secreted them, and, after cutting off the borders of the photographs which recorded the words "Top Secret" and the Warning Notice as well as any indication of their source, mailed them to Derek Wood personally. *Jane's Defence Weekly* published the photographs in its weekly edition a few days later and made the pictures available to other news agencies.[2] One of these photographs was published on August 8, 1984 in the *Washington Post.* When the Navy officers saw the photographs, they began a search and discovered that the photographs had been stolen. An investigation was immediately begun to ascertain the identity of the thief.

In the investigation of the theft, the defendant was interrogated. He denied ever seeing the photographs and professed to know nothing about the purloining of the photographs.[3] He persevered in this denial

---

2. Shortly after this, Wood authorized a payment of $300 to the defendant for his services during the period when the defendant had furnished him this information.

3. Even while the defendant was denying that he was responsible for delivery of the photographs to Derek Wood, he was telephoning Wood in London to exult that the theft of the photographs could not be traced to ["him"].

for some time, even going so far as to identify two fellow employees who he said should be questioned about the disappearance of the photographs. On August 22, 1984, the authorities seized the defendant's typewriter ribbon at work. An analysis of the ribbon revealed numerous letters to *Jane's*, including a summary of a secret report on the Severomorsk explosion. At about the same time, the Navy also was able to secure a return of the photographs from *Jane's*. A fingerprint was discovered on one of the photographs and the fingerprint was identified as that of the defendant. With this information, the FBI interviewed the defendant anew and the arrest of the defendant followed on October 1, 1984.[4]

When arrested, the defendant repeated his many denials of any connection with the theft of the photographs, though the arresting officer told him they had discovered his fingerprints on the photographs, demonstrating that he was not truthful when he said he had never seen the photographs. At this point, the defendant asked for a break in the interrogation. When the interview was resumed, the defendant renewed his denial of any connection with the theft. However, the arresting officers told him they did not accept his denial and one of the officers proceeded to summarize the material they had demonstrating the defendant's guilt. At the end of the summarization, one of the officers suggested that perhaps the defendant had felt that publicizing the progress the Soviets were making in developing a naval force would enable the Navy to obtain greater appropriations. The defendant seemed to jump at this suggestion. The Government did not accept such proposed excuse because of all the evidence it had indicating that the defendant was making available secret material to Wood and *Jane's* as a means of furthering his application for employment by *Jane's* and for payment. He, however, did not admit that he had sent other information to Wood, particularly that relating to the explosion at Severomorsk. The offi-

cers, however, that day obtained a second warrant to search the defendant's home. That search revealed the presence of two "secret" NISC intelligence reports on the explosion at Severomorsk in an envelope marked "For Derek Wood only" in defendant's apartment.

At trial the Government offered evidence of defendant's admission of the theft of the photographs, of his cutting off the "Secret" and "Intelligence Service" statements on outer sides of the photographs and of his mailing of the photographs to Derek Wood. There was also proof of the defendant's attempt to secure employment with *Jane's* and of *Jane's* payment to the defendant. The Government presented proof of much of this in letters of the defendant to *Jane's* or Wood. The Government also offered in evidence the "Secret" military information found in the defendant's apartment. The defendant by way of defense presented witnesses who testified that the photographs and the secret documents found in the secretary of defendant's apartment involved nothing in the way of information that could be harmful to the United States or advantageous to the Soviet Union. The Government offered rebuttal testimony to demonstrate that the photographs, as well as the other governmental military defense secret documents found in defendant's apartment, provided information of advantage to the Soviet Union and against the interests of the United States. At the conclusion of the testimony, the defendant moved for a directed verdict. The motion was denied. The cause was then submitted to the jury which returned a verdict of guilty on all counts. Sentencing followed. The defendant has appealed his conviction on various claims of error. We find all the claims without merit and affirm the judgment of conviction.

The defendant's claim of error in denying his motion for a directed verdict naturally divides into two separate arguments: the first addresses the charges set forth in counts 1 and 3 of the indictment charging

---

**4.** There was no objection entered by the defendant to the voluntariness or legality of the inter- rogation.

violations of sections 793(d) and (e); the second relates to counts 2 and 4 and charges violations of section 641. His contentions with respect to the first claim under sections 793(d) and (e) are that his activity as set forth in the two counts of the indictment was not within the literal or intended prohibitions of the relevant statutes and that, if within the prohibition of the statutes, whether read literally or in accord with legislative intent, such statutes are constitutionally invalid for vagueness and overbreadth. His position with reference to the prosecution under section 641 is that his conduct was simply not covered by the statutory prohibition. We shall discuss the two claims of error separately, beginning with those relating to the convictions under sections 793(d) and (e).

## II.

### The Convictions under Sections 793(d) and (e)

■ The initial defense of the defendant to his prosecution as stated in Counts 1 and 3 of the indictment (sections 793(d) and (e)), rests on what he conceives to be the meaning and scope of the two espionage statutes he is charged with violating. It is his position that, properly construed and applied, these two subsections of 793 do not prohibit the conduct of which he is charged in those counts. Stated more specifically, it is his view that the prohibitions of these two subsections are to be narrowly and strictly confined to conduct represented "in classic spying and espionage activity" [5] by persons who, in the course of that activity had transmitted "national security secrets to agents of foreign governments with intent to injure the United States." He argued that the conduct of which he is charged simply does not fit within the mold of "classical spying" as that term was defined, since he transmitted the national security secret materials involved in the indictment to a recognized international naval news

organization located in London, England, and not to an agent of a foreign power. In short, he leaked to the press; he did not transmit to a foreign government. It therefore follows, under his construction of the statutes, that he was not guilty of their violation by his transmittal of this national security material, even though, under the government's proof, he had without authorization and clandestinely abstracted that material from the highly secret national intelligence office in which he worked and had, with reason to know that the publication of such materials reasonably would imperil the secrecy and confidentiality of the nation's intelligence-gathering capabilities, communicated such materials to one "not entitled to receive" them, reasonably knowing that the receiver of the material would publish it to all the world. Such is the initial ground on which the defendant declares that his motion for acquittal on the charges in counts one and three of the indictment (section 793(d) and (e)) was erroneously overruled.

The defendant does not predicate his argument relating to the scope of the statutory meaning on the actual facial language of the statutes themselves. It is fair to say he concedes that the statutes themselves, in their literal phrasing, are not ambiguous on their face and provide no warrant for his contention.[6] Both statutes plainly apply to "whoever" having access to national defense information has under section 793(d) "wilfully communicate[d], deliver[ed] or transmit[ted] ... to a person not entitled to receive it," or has retained it in violation of section 793(e). The language of the two statutes includes no limitation to spies or to "an agent of a foreign government," either as to the transmitter or the transmittee of the information, and they declare no exemption in favor of one who leaks to the press. It covers "anyone." It is difficult to conceive of any language more definite and clear.

---

5. Appellant's brief at 19–20.

6. Because we find the statute involved to be clear and unambiguous, the rule that "when there are two rational readings of a criminal statute, one harsher than the other, we are to

choose the harsher only when Congress has spoken in clear and definitive language," *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), is therefore inapplicable here.

Admitting, however, that the statutes construed literally as they are facially stated did apply to his conduct, the defendant posits that the legislative history demonstrates conclusively that these statutes, whatever their facial language, were to be applied only to "classic spying" and that they should be limited in their application to this clear legislative intent. The threshold difficulty in pressing this contention in this case is the rule that when the terms of a statute are clear, its language is conclusive and courts are "not free to replace ... [that clear language] with an unenacted legislative intent." *INS v. Cardoza–Fonseca*, 480 U.S. ——, ——, 107 S.Ct. 1207, 1224, 94 L.Ed.2d 434, 461 (Scalia, J. concurring) (1987). We have recently reaffirmed this rule in *United States v. James*, 834 F.2d 92, (4th Cir.1987): "If the terms of this statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation, then 'judicial inquiry is complete,' *Rubin v. United States*, 449 U.S. 424, 430 [101 S.Ct. 698, 701] 66 L.Ed.2d 633 (1981); there is no need to consult legislative history nor to look to the 'rule of lenity' that is applied in construing ambiguous criminal statutes." [7] This rule is departed from only in those rare and "exceptional circumstances," *Burlington Northern R. Co. v. B.M.W.E*, —— U.S. ——, 107 S.Ct. 1841, 1860, 95 L.Ed.2d 381 (1987), where "a literal reading of [the] statute [will] produce a result 'demonstrably at odds with the intentions of its drafters,'" *United States v. Locke*, 471 U.S. 84, 93, 105 S.Ct. 1785, 1792, 85 L.Ed.2d 64 (1985), or "'where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute,'" *Trans Alaska Pipeline Rate*

*Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), citing *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965), or where "an absolutely literal reading of a statutory provision is irreconcilably at war with the clear congressional purpose, [in which case] a less literal construction ... [may] be considered." *United States v. Campos–Serrano*, 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971). None of those "exceptional" conditions for a departure from the rule for literal construction exists in this case. For that reason there is no reason or warrant for looking to the legislative history of sections 793(d) and (e) to ascertain their meaning.

■ We are convinced, though, that the legislative history will not support the defendant's construction of sections 793(d) and (e). When a statute is a part of a larger Act as these statutes are, the starting point for ascertaining legislative intent is to look to other sections of the Act *in pari materia* with the statute under review. *Erlenbaugh v. United States*, 409 U.S. 239, 244–47, 93 S.Ct. 477, 480–82, 34 L.Ed.2d 446 (1972).[8] Section 793(d) was a part of the Espionage Act of 1917;[9] section 793, however, is but one section of the Espionage Act of 1917; as equally as important a section of the Act was section 794. That Act, with its inclusion of 793(d) and 794, was submitted by the Department of Justice to the Congress. It had been drafted in the Department under the supervision of Assistant Attorney General Charles Warren,[10] a respected authority on constitutional law and the author of one of the most exhaustive and distinguished histories of the Supreme Court of the United States when published.[11] The purpose of

---

**7.** *See also United States v. Bass*, 404 U.S. at 347, 92 S.Ct. at 522, on "the rule of leniency," *supra*, Note 6.

**8.** *Erlenbaugh* is singularly like this case. The Court was construing a statute within an Act which sought to cover "a broad spectrum of 'unlawful activity,'" and to do this by attacking various aspects of such "activity" by separate provisions much as the Espionage Act does.

**9.** In the original Act of 1917, subsection (e) was not included; that subsection was added to the

Act in the revision of 1950. Therefore, we refer, when speaking of the original Act, only in terms of section 793(d) but the same general considerations will apply to (e) since it was intended to supplement (d) by criminalizing retention.

**10.** Rabban in 50 U.Chi.L.Rev. 1218 describes Warren as the "chief author" of the Act.

**11.** Warren, *The Supreme Court in the History of the United States*, 3 vols., Little, Brown, 1923. Chief Justice Rehnquist cites this work in his

the drafter was to break down the Act into very specific sections, prescribing separate and distinct offenses or crimes, and providing varying punishments for conviction under each section dependent on the seriousness of each of the offenses. This purpose of the Act was recognized by us in *Boeckenhaupt v. United States,* 392 F.2d 24, 28 (4th Cir.1968), *cert. denied,* 393 U.S. 896, 89 S.Ct. 162, 21 L.Ed.2d 177 (1968) and we in that case upheld the power of the Congress so to break down the Espionage Act with separate and distinct sections, covering separate and distinct activities, saying:

> We do not doubt the power and authority of Congress to break down into separate offenses various aspects of espionage activity and to make each separate aspect punishable as provided separately in 18 U.S.C. § 793 and 18 U.S.C. § 794.

█ It is obvious from this quotation from *Boeckenhaupt* that we in that case concluded that sections 793 and 794 were intended to and did cover separate and distinct offenses, with separate and distinct punishment provided for each offense. It is important, therefore, to ascertain the essential element in each section which made it separate and distinct from the other. Both statutes dealt in common with national defense materials and both statutes define the national interest materials covered by them in substantially the same language. Both prohibit disclosure. The two statutes differ—and this is the critical point to note in analyzing the two statutes—in their identification of the person to whom disclosure is prohibited. In section 793(d) that party to whom disclosure is prohibited under criminal sanction is one "not entitled to receive" the national defense material. Section 794 prohibits disclosure to an "agent ... [of a] foreign government...." Manifestly, section 794 is a far more serious offense than section 793(d); it covers the act of "classic spying"; and, because of its seriousness, it authorizes a far more serious punishment than that provided for section 793(d). In section 794, the punishment provided is stated to

be "punish[ment] by *death* or by imprisonment for any term of years or for life" (Italics added). The punishment for violation of section 793(d) is considerably more lenient: A fine of "not more than $10,000 or imprisoned not more than ten years, or both." In short, section 794 covers "classic spying"; sections 793(d) and (e) cover a much lesser offense than that of "spying" and extends to disclosure to *any* person "not entitled to receive" the information. It follows that, considered in connection with the structure and purposes of the Espionage Act as a whole and with other sections of the Act *in pari materia* with it, section 793(d) was not intended to apply narrowly to "spying" but was intended to apply to disclosure of the secret defense material to *anyone* "not entitled to receive" it, whereas section 794 was to apply narrowly to classic spying.

Beyond this, the legislative record itself shows unmistakably that section 793(d) was intended to apply to disclosure simply to anyone "not entitled to receive" national defense information and was specifically *not* restricted to disclosure to "an agent ... [of a] foreign government." Thus, when the Espionage Act was submitted to the Senate by Senator Overman on behalf of the Senate Judiciary Committee he was queried on the language in what was later codified as section 793(d) identifying the person to whom disclosure of secret national defense information was prohibited by that section; that is, he was asked to interpret the meaning of the phrase to "one not entitled to receive it" in the statute. His response was: "That (*i.e.,* not entitled to receive) means against any statute of the United States or against any rule or regulation prescribed." [12] Senator (later Justice) Sutherland, also a member of the Judiciary Committee, observed at the time that "the phrase 'lawfully entitled' means nothing more and nothing less than that the particular information must have been forbidden, not necessarily by an act of Congress; because in dealing with military matters the

bibliography in his recent publication, *The Supreme Court,* (Wm. Morrow, 1987).

12. 54 Cong.Rec. 3586 (1917).

President has very great powers." [13] As so explained section 793(d) was accepted at the time by the Senate and this interpretation remained throughout the legislative process as the accepted definition of the meaning of the critical phrase. Later, when Congress was enacting a revision of the Espionage Act in 1950 by adding certain language to sections 793(d) and a new subsection (e), the House Judiciary Committee, in a report on the revised statute, had occasion to advert again to the meaning of the words "one entitled to receive" secret national defense information. It said:

> Section 1(d) [793(d)] provides that those having lawful possession of the items described therein relating to the national defense who willfully communicate or cause to be communicated, or attempt to communicate them to an unauthorized person, or who willfully fail to deliver them to an authorized person on demand, shall be guilty of a crime. [14]

It seems abundantly clear from this legislative history that sections 793(d) and (e) were not intended to be restricted in application to "classic spying" but were intended to criminalize the disclosure to anyone "not entitled to receive it." [15] Accordingly, whether we look to the literal language of the statutes themselves, to the structure of the Act of which the sections were a part, or to the legislative history, sections 793(d) and (e) may not be limited in their scope to "classic spying," as the defendant argues.

As a final argument for narrowing the statutes to spying, the defendant points to the fact that only in one publicized case has the Government sought to prosecute anyone who had disclosed national defense information to one who was not "an agent of ... a foreign government" but to one simply "not entitled to receive" the information and in that one case the prosecution had been dismissed for prosecutorial misconduct. [16] It describes all the other prosecutions under the Espionage Act to involve disclosures or delivery to an agent of a foreign government. From this failure of prosecution of anyone for disclosure to one not an agent of a foreign government, the defendant would find proof that the government itself had considered the statutes, whatever their clear language, to apply solely to spying.

It is true that some prosecutions under these statutes have involved defendants alleged to have been acting for a foreign government though many of them also contained counts under sections 793(d) and (e)

---

13. 54 Cong.Rec. 3489 (1917).

14. H.R.Rep. No. 647, 81st Cong., 1st Sess.1949. Obviously the Committee has blended the later codified (e) with (d) at this point. Later (e) was made a new subsection.

15. Edgar and Schmidt, *The Espionage Statutes and Publications of Defense Information,* 73 Colum.L.Rev. 929, 1009 (1973), refer to the subsequent elimination from the Act, as finally enacted, of section 6 of the Act as drafted by the Department of Justice. This section 6 gave the President the power of censorship (prior restraint) through classification of defense information. The authors argue that this action of Congress in some way nullified the application of section 793(d).

We do not agree that the validity of section 793 depended on the enactment of Section 6 (the censorship provision). It must be remembered that section 793 was not new; it was merely a restatement of an earlier statute enacted in 1911 which criminalized disclosure of "any document ... or knowledge of anything connected with national defense" to "any person not entitled to receive it." 36 Stat. 1084, section 1 (1911). That statute did not include any classification provision. It assumed, as Senator (later Justice) Sutherland later indicated in the discussion of the 1917 Act, that the administration—in particular—the President had authority to provide by "rule or regulation" who might "not lawfully receive" defense information under both the 1911 statute as well as under the 1917 statute and this authority did not depend on the enactment of section 6 of the Espionage Act of 1917. Certainly, if Congress had perceived that the failure to enact a classification act in the 1917 Act made section 793(d) a nullity, it would seem unlikely that Congress would in the 1950 revision have reenacted such a defective statute.

For an update of the article by Edgar and Schmidt, written after the district court trial in *Morison, see* Edgar and Schmidt, *Curtiss-Wright Comes Home: Executive Power and National Security Secrecy,* 21 Harv. C.R.-C.L.L.Rev. 349 (1986), particularly its discussion of "The Morison Case," pages 396 to 407.

16. *United States v. Russo,* No. 9373–WMB–CD (C.C.Cal.), dismissed for prosecutorial misconduct. New York Times, May 12, 1973.

and that apparently only one prosecution of someone not a "spy" prior to this one has been initiated solely under these statutes —a prosecution that was aborted by prosecutorial misconduct.[17] This statement, though strictly accurate, is misleading. It is true that the *Russo* case is the only case in which the prosecution was based solely on a violation of sections (d) and (e), but it is not correct to say that there have not been other cases in which the defendant was prosecuted under sections 793(d) and (e). Actually, *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir.1981), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982), *United States v. Kampiles*, 609 F.2d 1233 (7th Cir.1979), *United States v. Boyce*, 594 F.2d 1246 (9th Cir.1979) and *United States v. Smith*, 592 F.Supp. 424 (S.D.Va.1984), *vacated and remanded on other grounds*, 780 F.2d 1102 (4th Cir.1985), for instance, all included separate counts covering violations of sections (d) and (e) and the defendant was convicted under these counts. Practically all these cases included, of course, counts under section 794, too, and the defendants were convicted under these counts. But the important fact is that sections 793(d) and (e) are not treated as obsolete sections but have been the basis for prosecution in a number of cases. Moreover, Congress has not treated these statutes as obsolete. In the 1950 revision, it strengthened section 793 by adding (e) and, so strengthened, reenacted the section.

It is unquestionably true that the prosecutions generally under the Espionage Act, and not just those under section 793(d), have not been great. This is understandable. Violations under the Act are not easily established. The violators act with the intention of concealing their conduct. They try, as the defendant did in this case, to leave few trails. Moreover, any prosecution under the Act will in every case pose difficult problems of balancing the need for prosecution and the possible damage that a public trial will require by way of the disclosure of vital national interest secrets in

a public trial. *Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). All these circumstances suggest that the rarity of prosecution under the statutes does not indicate that the statutes were not to be enforced as written. We think in any event that the rarity of the use of the statute as a basis for prosecution is at best a questionable basis for nullifying the clear language of the statute, and we think the revision of 1950 and its reenactment of section 793(d) demonstrate that Congress did not consider such statute meaningless or intend that the statute and its prohibitions were to be abandoned.

We therefore conclude that the legislative history does not justify the rewriting of this statute so as to nullify its plain language by limiting the statutes' application to the "classic" spy, even if we should assume—in our opinion, improperly—that it was appropriate to look to legislative history in order to ascertain the application of the plain literal language of sections 793(d) and (e). Nor do we find of any relevance whether there have been few prosecutions under these sections.

The legislative record is similarly silent on any Congressional intent in enacting sections 793(d) and (e) to exempt from its application the transmittal of secret military information by a defendant to the press or a representative of the press. Actually, there was little or no discussion of the First Amendment in the legislative record *directly* relating to sections 793(d) and (e) in this connection. There was, it is true, discussion of the First Amendment during the enactment of the Espionage Act of 1917 as a whole, but Professor Rabban, who reviewed carefully the legislative record, concluded that the focus of such discussion was on "[a] provision of the bill that would have allowed the President to censor the press dominated congressional discussion and was eventually eliminated by the conference committee" but "[i]ronically, the section of the bill that ultimately provided the basis for most of the prosecu-

---

**17.** Freedom of the press issues arise only when the enforcement of governmental secrecy impacts the press itself. Henkin, *The Right to*

*Know and the Duty to Withhold: The Case of the Pentagon Papers,* 120 U.Pa.L.Rev. 271, 277 (1971).

tions [which included section 793(d), subsection (e) not being added until the 1950 revision] hardly received any attention" in that discussion. Rabban, *The Emergence of Modern First Amendment Doctrine*, 50 U.Chi.L.Rev. 1205, 1218 (1983). What legislative discussion of section 793(d) as there was related to the meaning of the phrase "one not entitled to receive it" and the term "information respecting the national defense." We deal with these discussions later in our disposition of consideration of the defendant's vagueness and overbreadth claims. There is, however, no evidence whatsoever in the legislative record that the Congress intended to exempt from the coverage of section 793(d) national defense information by a governmental employee, particularly by one who had purloined from the files of the Department such information, simply because he transmitted it to a representative of the press.

But, though he cannot point to anything in the legislative record which intimates that Congress intended to exempt "leaks to the press," as the defendant describes it, he argues that, unless such an exemption is read into these sections they will run afoul of the First Amendment. Actually we do not perceive any First Amendment rights to be implicated here. This certainly is no prior restraint case such as *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and *United States v. Progressive, Inc.*, 467 F.Supp. 990, and 486 F.Supp. 5 (W.D.Wis.1979). It is a prosecution under a statute, of which the defendant, who, as an employee in the intelligence service of the military establishment, had been expressly noticed of his obligations by the terms of his letter of agreement with the Navy, is being prosecuted for purloining from the intelligence files of the Navy national defense materials clearly marked as "Intelligence Information" and "Secret" and for transmitting that material to "one not entitled to receive it." And the prosecution premises its prosecution on establishing that he did this knowingly and "wilfully" as evidenced by the manner in which he sought to conceal the "Secret" character of the information and the efforts he had taken to thwart any

tracing of the theft to him. We do not think that the First Amendment offers asylum under those circumstances, if proven, merely because the transmittal was to a representative of the press. This conclusion in our view follows from the decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

In *Branzburg*, a news reporter had written, and his paper had published, an article describing certain criminal activity by two individuals witnessed by the reporter under a pledge by him that he would protect the identity of the two offenders. A grand jury investigating the criminal activity subpoenaed the reporter in order to examine him on the identity of the two individuals and on their criminal activity. He sought to avoid the process on the ground that it would be a violation of his First Amendment right in news-gathering to require him to expose or identify his informants. He said to deny him protection in this regard would make it extremely difficult, if not impossible, for him to gather news. The Supreme Court denied the plea, and, in the course of so doing, made certain rulings which are pertinent in this connection. The Court, in Justice White's opinion in that case, said at 691–92, 92 S.Ct. at 2661–62:

> It would be frivolous to assert—and no one does in these cases—that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons. To assert the contrary proposition

"is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity and implies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends.... It suffices to say that, however complete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrong-doing." *Toledo Newspaper Co. v. United States*, 247 U.S. 402, 419–20 [38 S.Ct. 560, 564, 62 L.Ed. 1186 (1918) ].[18]

*United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir., *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), though not as directly on point as *Branzburg*, is instructive in this regard. In that case, the United States sought an injunction to prevent a former Central Intelligence Agency [CIA] employee, who had signed a confidentiality agreement not to divulge naval classified information to which he had access from publishing classified CIA information after he left the CIA. The employee contended such a restraint violated his First Amendment rights. We affirmed the granting of the restraint. In so doing, the Court made this statement in response to the employee's First Amendment claim:

Thus Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain.

Subsequently in *Snepp v. United States*, 444 U.S. 507, 508, 100 S.Ct. 763, 764, 62 L.Ed.2d 704 (1980), another case which, though not directly on point, is relevant here. There the Supreme Court reviewed the right of the United States to enforce an agreement by a former CIA employee, that he would not "publish ... any information or material relating to the Agency, its activities ... without specific prior approval by the Agency." The defendant had violated the agreement by publishing a book with some material relating to the CIA in it without securing CIA prior approval for such publication. The Supreme Court assumed the propriety of the restraint on publication in this agreement.

If *Branzburg, Marchetti,* and *Snepp* are to be followed, it seems beyond controversy that a recreant intelligence department employee who had abstracted from the government files secret intelligence information and had wilfully transmitted or given it to one "not entitled to receive it" as did the defendant in this case, is not entitled to invoke the First Amendment as a shield to immunize his act of thievery. To

18. Justice White in his opinion, did say that "news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." 408 U.S. at 707, 92 S.Ct. at 2670. And, in his concurring opinion, Justice Powell wrote to emphasize what he conceived to be the ruling of the Court. He said that newsmen had a constitutional right to be protected from harassment and he laid down a procedure in three steps for determining whether requiring the newsman to expose his source constituted harassment. Under the test, the right to require the journalist to expose his source is one to be determined by considering "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." *See Larouche v. National Broadcasting Co., Inc.,* 780

F.2d 1134, 1139 (4th Cir.1986). In a footnote on page 710 (*Branzenburg,* 408 U.S., 92 S.Ct. on page 2671), Justice Powell expressed his disagreement with the dissenting opinion's ruling under which, as he viewed it, the trial court would be permitted "to protect newsmen from improper or prejudicial questioning" and declared that such ruling, if applied, would heavily subordinate "the essential societal interest in the detection and prosecution of crime" and "defeat a fair balancing" of the public interest.

*None of these comments is relevant here, since it is the right of an informer, who had clearly violated a valid criminal law, and not a newsman in issue.* What is in issue here is precisely what Justice White declared in the quoted language, *i.e.,* that the First Amendment, in the interest of securing news or otherwise, does not "confer a license on either the reporter or his news source to violate valid criminal laws."

permit the thief thus to misuse the Amendment would be to prostitute the salutary purposes of the First Amendment. Sections 793(d) and (e) unquestionably criminalize such conduct by a delinquent governmental employee and, when applied to a defendant in the position of the defendant here, there is no First Amendment right implicated. And it is not necessary to read into sections 793(d) and (e) an exception for national defense secret materials given the press, in order to sustain the constitutionality of such statutes. It is clear, as we have said, that Congress did not indicate anywhere in its legislative history that it intended to exempt from the coverage of section 793(d) and (e) one who, after stealing national defense secret material, "wilfully" delivered it to a representative of the press.

█ In summary, we conclude that there is no basis in the legislative record for finding that Congress intended to limit the applicability of sections 793(d) and (e) to "classic spying" or to exempt transmittal by a governmental employee, who entrusted with secret national defense material, had in violation of the rules of his intelligence unit, leaked to the press. Nor do we find any authority for the proposition that Congress could not validly prohibit a government employee having possession of secret military intelligence material from transmitting that material to "one not entitled to receive it," whether that recipient was the press or not, without infringing the employee's rights under the First Amendment. *Branzburg* is definitely to the contrary.

Even though the statutes are not to be confined strictly to "classic" spying and even though they contain no implicit exception in favor of transmittal of secret defense material to the press, the defendant argues that the statutes themselves, are constitutionally infirm for vagueness and overbreadth and the prosecutions under them should be stricken. We, therefore, proceed to address these attacks on the constitutionality of the statutes.

While admittedly vagueness and overbreadth are related constitutional concepts, they are separate and distinct doctrines, subject in application to different standards and intended to achieve different purposes.[19] The vagueness doctrine is rooted in due process principles and is basically directed at lack of sufficient clarity and precision in the statute;[20] overbreadth, on the other hand, would invalidate a statute when it "infringe[s] on expression to a degree greater than justified by the legitimate governmental need" which is the valid purpose of the statute.[21] Because of the differences in the two concepts, we discuss them separately in disposing of the defendant's argument, beginning with the defendant's claim of vagueness in sections 793(d) and (e) as applied to him.

It has been repeatedly stated that a statute which "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co., supra,* 269 U.S. at 391, 46 S.Ct. at 127; *Smith v. Goquen,* 415 U.S.

---

**19.** The difference in the two doctrines was stated by Justice Marshall in *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982):

A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process.

*See also,* G. Gunther, *Constitutional Law,* p. 1156, (Foundation Press, 11th ed. 1985):

An "overbreadth" challenge should not be confused with one based on "vagueness," though a challenger will often assert both grounds of invalidity. An unconstitutionally vague statute, like an overbroad one, creates

risks of "chilling effect" to protected speech and produces rulings of facial invalidity. But a statute can be quite specific—*i.e., not* "vague"—and yet be overbroad. The vagueness challenge rests ultimately on the procedural due process requirement of adequate notice, though it is a challenge with special bite in the First Amendment area.

**20.** *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

**21.** Redish, *The Warren Court, the Burger Court and the First Amendment Overbreadth Doctrine,* 78 Nw.U.L.Rev. 1031, 1034 (1984).

566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974); *Parker v. Levy*, 417 U.S. 733, 752, 94 S.Ct. 2547, 2559, 41 L.Ed. 2d 439 (1974). It is sufficient, though, to satisfy requirements of "reasonable certainty," that while "the prohibitions [of a statute] may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest ... [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise." *Arnett v. Kennedy*, 416 U.S. 134, 159, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974). And, in any event, it is settled beyond controversy that if one is not of the rare "entrapped" innocents but one to whom the statute clearly applies, irrespective of any claims of vagueness, he has no standing to challenge successfully the statute under which he is charged for vagueness. *Parker v. Levy, supra,* 417 U.S. at 756, 94 S.Ct. at 2561. Finally, the statute must be read in its entirety and all vagueness may be corrected by judicial construction which narrows the sweep of the statute within the range of reasonable certainty.

█ Applying these standards for measuring a statute for vagueness, we turn to the specific provisions of sections 793(d) and (e) which the defendant would find unconstitutionally vague. He identifies two terms in the statutes which he says are vague within the constitution prohibition. The first of these is the phrase, "relating to the national defense." The defendant concedes that this phrase was assailed as unconstitutionally vague in *United States v. Dedeyan*, 584 F.2d 36, 39 (4th Cir.1978), a prosecution under section 793(f)(2). In responding to that contention, we stated in *Dedeyan* that the term "relating to the national defense" was not "vague in the constitutional sense." The defendant would distinguish this case from *Dedeyan* because the prosecution there was under subsection (f)(2) which contains a scienter requirement.[22] Subsections (d) and (e),

however, have the same scienter requirement as subsection (f)(2). They prescribe that the prohibited activity must be "wilful." The district judge defined "wilfully" in his jury instructions as follows:

All four of these counts as I have referred to them in my description of them to you used the word *wilfully*. An act is done *wilfully* if it is done voluntarily and *intentionally* and with the *specific intent to do something that the law forbids. That is to say, with a bad purpose either to disobey or to disregard the law.* With respect to the offenses that are charged in the indictment specific intent must be proved beyond a reasonable doubt before a defendant can be convicted. Specific intent, as that term suggests, requires more than a general intent to engage in a certain conduct. To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids. It is the government's burden to present affirmative evidence of the existence of the required unlawful intent. Again, in determining whether or not the intent existed you may look at all the facts and the circumstances involved in the case. (Italics added)

Moreover, in his instructions, the district judge also gave this definition of "national defense":

And that term, the term national defense, includes all matters that directly or may reasonably be connected with the defense of the United States against any of its enemies. It refers to the military and naval establishments and the related activities of national preparedness. To prove that the documents or the photographs relate to national defense there are two things that the government must prove. First, it must prove that the disclosure of the photographs would be potentially damaging to the United States or might be useful to an enemy of the United States. Secondly, the government must prove that the documents or the photographs are closely held in that

22. Appellant's brief at 31.

[they] ... have not been made public and are not available to the general public.[23] Combining the two instructions, the one on wilfulness and the one defining national defense, the district judge in this case gave precisely the instruction on this vagueness issue that we approved in *United States v. Truong Dinh Hung, supra,* 629 F.2d at 919.[24]

The defendant would, however, argue that the district judge's jury instructions which we find removed any possibility of vagueness in the application of the statutes, actually imparted vagueness into the phrases "related to national defense" and "wilfulness." His argument on the term "related to national defense" is directed at the district judge's instruction that, in order to "prove that the documents or photographs" herein involved "related to national defense," the government must prove "the disclosure of the photographs would be *potentially damaging* to the United States or might be useful to the enemy of the United States." He attacks the use of the phrase "potentially damaging," italicized as above as too indefinite; he contends the word "actual" should have been used, for "potentially." The phrase "potentially damaging" was used by Justice White in his concurring opinion in *United States v. New York Times, supra,* 403 U.S. at 740, 91 S.Ct. at 2154, and in *Dedeyan* the district judge used the term in his instructions, an instruction we expressly approved on appeal.[25] Beyond this, when both the government and defense counsel were examining witnesses on the issue whether the photographs and documents in issue in this case were "damaging to the United States," they used the phrase "potentially damaging." Thus, as demonstrated by the way in which they presented the question to the jury, the defendant's coun-

sel posed the issue as "potentially damaging" and it would not seem that the defendant may now complain because the district judge adopted the qualifying phrase as used by his counsel in developing the record for submission of the issue to the jury. Moreover, as we have said, this exact language in this same context was approved by us in *Dedeyan.* The defendant, however, would dismiss this fact with the comment that *Dedeyan* was an espionage case and that instructions which may be permissible in an espionage case "are not sufficient in a leak case where First Amendment interests must be weighed in the balance." He supports this argument with a citation to a law review article in 9 Yale J.World Pub.Order, at 87 (1982), which he contends states that "no First Amendment values are at stake" in an espionage case. This argument, however, overlooks the fact that the prosecution of the defendant was not under section 794 of the Act but was under section 793(f)(2), a section related to the very sections under which the defendant in this case is charged. We find no error in the instruction and, particularly in its use of the word "potentially" in the district court's instruction.

The second point of the defendant goes to the definition of "wilfully" as included in the district court's jury instructions. The defendant asserts that the district court, in its instructions in this regard, had said that "[p]roof of the most laudable motives, or any motive at all, is irrelevant under the statute." In his brief, he gives three record citations in support of his contention on this point. Two of these citations are extracted from the district court's opinion on the defendant's motion to dismiss the indictment herein. In the argument on his motion, the defendant, through his counsel,

---

**23.** J.A. at pp. 1123–24.

**24.** *See also Ellsberg v. Mitchell,* 709 F.2d 51, 59 (D.C.Cir.1983) *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984), in which the issue arose whether certain material dealing with intelligence operations met the test of "relating to national defense" and whether as such it was protected as a state secret. The district court had found it did and, on appeal, the Court of Appeals reviewed *in camera* the material,

finding that it did, saying that "there is a 'reasonable danger' that revelation of the information in question would either enable a sophisticated analyst to gain insights into the nation's intelligence-gathering methods and capabilities or would disrupt diplomatic relations with foreign governments."

**25.** 584 F.2d at 39.

urged the district court to adopt the definition of "wilfully" as used in *Hartzel v. United States*, 322 U.S. 680, 686, 64 S.Ct. 1233, 1236, 88 L.Ed. 1534 (1944). That was a "pure speech" case and not one which was "in the shadow of the First Amendment" as here. The defendant in that case had written and published a scurrilous pamphlet attacking our allies in World War II and favoring peace with Germany in order to eliminate a war "between whites." He was indicted under the Espionage Act for "wilfully" attempting to "cause insubordination, disloyalty, mutiny or refusal of duty, in the military or naval forces of the United States...." The Supreme Court found the statute under which the defendant was indicted required "a specific intent or evil purpose" to violate the statute. It said: "That word [wilfully], when viewed in the context of a highly penal statute restricting freedom of expression, must be taken to mean *deliberately and with a specific purpose to do the acts proscribed by Congress*." 322 U.S. at 686, 64 S.Ct. at 1236. (Italics added) The district court in this case construed the "wilfully" language in *Hartzel* to require "that the prohibited act be done deliberately and with a specific purpose to do that which was proscribed." That is precisely the manner in which *Hartzel* said the instruction should be given and that was the precise instruction that was given in this case.

As a matter of fact, the instruction as given does not include the language, "no showing of evil purpose is required under this statute," or the language, "proof of the most laudable motives, or any motive at all, is irrelevant under the statute;" [26] the instruction as given conformed essentially to the language of the Supreme Court in *Hartzel*.

In summary, we find no basis in this case for the invalidation of the statutes for either vagueness or overbreadth or for voiding the defendant's conviction under 793(d) and (e).

■ Moreover, the defendant in this case knew that he was dealing with national defense material which a "foreign government in possession of ... would be in a position to use it either for itself, in following the movements of the agents reported upon, or as a check upon this country's efficiency in ferreting out foreign espionage." *Gorin v. United States*, 312 U.S. 19, 29, 61 S.Ct. 429, 434, 85 L.Ed.2d 488 (1941). He was an experienced intelligence officer. He had been instructed on all the regulations concerning the security of secret national defense materials. *See United States v. Jolliff*, 548 F.Supp. 229, 230 (D.Md.1981); *United States v. Wilson*, 571 F.Supp. 1422, 1426–27 (S.D.N.Y.1983). With the scienter requirement sections 793(d) and (e), bulwarked with the defendant's own expertise in the field of governmental secrecy and intelligence operations, the language of the statutes, "relating to the national security" was not unconstitutionally vague as applied to this defendant and this is especially true, since the trial judge, under proper instructions, left for the jury, as he should have, the determination whether the materials involved met the test for defense material or information and the jury found they did. *Gorin v. United States*, supra, 312 U.S. at 32, 61 S.Ct. 429, 436, 85 L.Ed. 488 ("The question of the connection of the information with national defense is a question of fact to be

26. It is interesting, though, that the House Committee, in its Report on section 793(d) in connection with the 1950 revision of the Act used this language (H.R.Rep. No. 647, 81st Cong., 1st Sess. (1949), at 3–4:

Subsection 1(d) [793(d) ] provides that those having lawful possession of the items described therein relating to the national defense who willfully communicate or cause to be communicated, or attempt to communicate them to an unauthorized person, or who willfully fail to deliver them to an authorized person on demand, shall be guilty of a crime.

No showing of intent is necessary as an element of the offense, provided the possessor has reason to believe that the material communicated could be used to the detriment of the United States or to the advantage of a foreign nation. The absence of a requirement for intent is justified, it is believed, in contrast to the express requirement of intent in subsections 1(a), 1(b) and 1(c), in view of the fact that subsection 1(d) deals with persons presumably in closer relationship to the Government which they seek to betray.

determined by the jury as negligence upon undisputed facts is determined"); *United States v. Boyce*, 594 F.2d 1246, 1251 (9th Cir.1979); Note, *The Constitutionality of Section 793 of the Espionage Act and Its Application to Press Leaks*, 33 Wayne L.Rev. 205, 214–17 (1986). Further, the materials involved here are alleged in the indictment and were proved at trial to be marked plainly "Secret" and that classification is said in the Classification Order to be properly "applied to information, the unauthorized disclosure of which could reasonably be expected to cause serious damage to the national security."[27] That definition of the material may be considered in reviewing for constitutionality the statute under which a defendant with the knowledge of security classification that the defendant had is charged. *United States v. Walker*, 796 F.2d 43, 47 (4th Cir.1986). We are thus convinced that the statutory language "relating to the national defense," as applied to the defendant, is not constitutionally vague under our prior decisions reviewing section 793.

■ The defendant would also indict the phrase "entitled to receive" as vague. The defendant finds this phrase vague because it does not spell out exactly who may "receive" such material. However, any omission in the statute is clarified and supplied by the government's classification system provided under 18 U.S.C. App. 1 for the protection of the national security and the district judge so ruled.[28] And courts have recognized the legitimacy of looking to the classification system for fleshing out the phrases such as that in question here. We did it specifically in *Truong* (629 F.2d at 919) and the court in *McGehee v. Casey*, 718 F.2d 1137, 1143–44 (D.C.Cir.1983) did it. As Professor Tamanaha said:

> [s]ince 1940 the primary method of classifying information has been through Executive Order. The current Order on classification [Exec.Order No. 12,356, 3 C.F.R. 166] (1982) was promulgated by

President Reagan in mid–1982. Essentially, under this Order information may be classified if "its disclosure reasonably could be expected to cause damage to the national security.... [and] harms to national security" include impairment of defense capabilities, disclosure of intelligence gathering techniques or capabilities, and disruption of diplomatic relations with other countries.

Tamanaha, *A Critical Review of the Classified Information Procedures Act*, 13 Am.J.Crim. Law 277, 284–85 (1986).

Under this Executive Order, the classification "Secret," which was the one given all the information involved in this prosecution, was to "be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security." Exec. Order No. 12,356, 3 C.F.R. 166 (1982), *reprinted in* 50 U.S.C. § 401 note (1982). Those Regulations were well known to the defendant and he had agreed in writing to abide by them. The defendant worked in a vaulted area where, as the district court observed, "even other employees of NISC were not allowed to enter," much less to read or transmit intelligence materials being reviewed therein. Certainly the phrase "not authorized to receive it" was well understood by the defendant. As to him, the statute was not vague in its reference to "one not entitled to receive it."

In *United States v. Girard*, 601 F.2d 69 (2d Cir.1979), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 in which there was a prosecution under 18 U.S.C. § 642 involving a sale or disclosure to an outsider of confidential law enforcement (DEA) records, the defendant raised a similar objection to that asserted by the defendant in this regard. The court found neither vagueness nor overbreadth in the statute.

We agree with this reasoning of the *Girard* court, which reasoning also lies at the

---

27. Exec. Order No. 12,356, 3 C.F.R. 166 (1982), *reprinted* 50 U.S.C. § 401 note (1982).

28. For a discussion of the statutory and constitutional authority for the classification system prior to the enactment of the Classified Infor-

mation Procedures Act, 18 U.S.C.App. 1, *see* Note, *The National Security Interest and Civil Liberties*, 85 Harv.L.Rev. 1130, 1198, *et seq.* (1972).

heart of the decision in *McGehee v. Casey*, 718 F.2d 1137 (D.C.Cir.1983), and was adopted by us in *Truong* (629 F.2d at 919 n. 10) as we have already observed. In *McGehee v. Casey*, the court was dealing with a claim of vagueness in the phrase "national security." It found that the term could be fleshed out by reference to the very Classification Order to which we look in clarifying the term "entitled to receive." 718 F.2d at 1143–44. We therefore hold that the words "entitled to receive" in the statute in this case can be limited and clarified by the Classification Regulations and, as so limited and clarified, are not vague. *United States v. Jolliff*, 548 F.Supp. 229, 230 (D.C.Md.1981); *United States v. Wilson*, 571 F.Supp. 1422, 1426–27 (S.D.N.Y.1983); *See* Wayne L.Rev., *supra* at 218.

■ Turning to the claim of overbreadth, we note at the outset that, unlike the situation presented by a vagueness claim,[29] the overbreadth doctrine "is an exception to our traditional rules of practice," *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 and has not been recognized outside the limited context of the First Amendment. *United States v. Salerno*, —— U.S. ——, ——, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987); *Schall v. Martin*, 467 U.S. 253, 269, n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984); *New York v. Ferber*, 458 U.S. 747, 767–74, 102 S.Ct. 3348, 3359–63, 73 L.Ed.2d 1113 (1982). So limited, it is "strong medicine," to be applied "with hesitation and then only as a last resort," and only if the statute cannot be given a narrowing construction to remove the overbreadth. *New York v. Ferber, supra* at 769, 102 S.Ct. at 3361. Thus, in *McGehee v. Casey*, 718 F.2d at 1146, Judge Wald held that "overbreadth analysis should not be deployed

when a limiting construction could save the rule from its constitutional defects," citing *Dombrowski v. Pfister*, 380 U.S. 479, 491, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965), and *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Moreover, a distinction must be made in this connection between statutes which regulate "conduct in the shadow of the First Amendment" and those which regulate pure speech. The rule makes a distinction "where conduct and not merely speech is involved." In the conduct context, "overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment," and in such a case "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. at 615, 93 S.Ct. at 2918. To be "substantial" in that context, the statute must reach "a substantial number of impermissible applications...." *New York v. Ferber*, 458 U.S. at 771, 102 S.Ct. at 3362.[30]

An authority on the scope of the doctrine has formulated a statement of what he characterizes as the three "fundamental circumstances" under which the doctrine may be applied after discussing the foregoing rules. These circumstances are: "(1) when 'the governmental interest sought to be implemented is too insubstantial, or at least insufficient in relation to the inhibitory effect on first amendment freedoms'; (2) when the means employed bear little relation to the asserted governmental interest; and (3) when the means chosen by the legislature do in fact relate to a substantial governmental interest, but that interest could be achieved by a 'less drastic means' —that is, a method less invasive of free speech interests." Redish, *The Warren*

---

29. There is one clear difference between vagueness and overbreadth doctrine: "Overbreadth analysis is perceived as an exception to the rule that an individual is not ordinarily permitted to litigate the rights of third parties; vagueness is not perceived as such an exception." L. Tribe, *supra* § 12–28, at 719–20. This, however, is not an invariable rule but one whose application depends on the facts of each case. *McGehee v. Casey*, 718 F.2d at 1146.

30. The "upshot" of *Ferber* and cases subsequent to it, as Professor Tribe puts it, "is a mounting burden on the *individual* to show that the apparent inhibition of protected expression [in the statute under review] is in fact highly probable and socially significant." L. Tribe, *American Constitutional Law, supra*, § 12–25, at 714.

*Court, the Burger Court and the First Amendment Overbreadth Doctrine,* 78 NW.U.L.Rev. 1031, 1035 (1983).

Unquestionably, these statutes are expressions of an important and vital governmental interest and have a direct relation to the interests involved here, and are, therefore, without the first and second requirement for the application of the overbreadth doctrine. It is thus plain that the first two circumstances posited by Professor Redish are met; the only "circumstances," under which these statutes could be voided for overbreadth, would be that the substantial governmental interest reflected in the statutes could be achieved by means "less invasive of free speech interests."

It has been said that the court, by narrowing constructions of a statute, may bring the statute within conformity with the rule requiring that it be applied by means "less invasive of free speech interests." The defendant would find a violation of the overbreadth doctrine in the failure of either the statute or in judicial rulings construing and limiting the statute to employ "a method less invasive of free speech interests" than is represented in the terms "national defense" and "one not entitled to receive." So far as any overbreadth in the term "national defense" was concerned, it was reasonably narrowed by the district court in its instructions to confine national defense to matters under the statute which "directly or may reasonably be connected with the defense of the United States," the disclosure of which "would be potentially damaging to the United States or might be useful to an enemy of the United States" and which had been "closely held" by the government and was "not available to the general public." This narrowing of the definition of "national defense" information or material removed any legitimate overbreadth objection to the term. The phrase "to one not entitled to receive" was defined in the legislative history of the statute to mean one "not authorized to receive," as we have already observed, and "not authorized to receive" was clearly covered by the Classification Act, to which we have already referred, because of its classification as "Secret" national de-

fense materials. It follows that there is no overbreadth in the two terms either as they may have been narrowed by court instruction or as fleshed out by the Classification Act.

## III.

### Conviction of Defendant under section 641

■ The defendant has also appealed his conviction under 18 U.S.C. § 641. That statute, as it relates to this case, imposes criminal penalties on anyone who "embezzles, steals, purloins or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof...." Count Two of the indictment herein charged the defendant with "knowingly and wilfully embezzl[ing], steal[ing], purloin[ing], and convert[ing] to his use and the use of another," and did knowingly sell "thing[s] of value to the United States ... three photographs, each classified 'Secret,' said photographs being the property of the Naval Intelligence Support Center and having a value greater than $100. In Count Four he was similarly charged with stealing and selling "portions of Two Naval Intelligence Support Center Weekly Wires," classified "Secret" and the property of the Naval Intelligence Support Center. Both counts cite as supporting authority 18 U.S.C. § 641. At trial ample evidence was established sustaining the charges.

It will be noted at the outset that section 641, on which these counts of the indictment rest, is not a disclosure statute such as section 793(d) and (e); it is a criminal statute covering the theft of government property. It is written in broad terms with the clear intent to sweep broadly as the Supreme Court recognized in *Morissette v. United States,* 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952):

What has concerned codifiers of the larceny type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have es-

caped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances.

Manifestly, as the Court in *Morissette* said the statute was not intended simply to cover "larceny" and "embezzlement" as those terms were understood at common law but was also to apply to "acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." 342 U.S. at 269, n. 28, 72 S.Ct. at 253, n. 28. Following this analysis, Judge Winter in *Truong* wrote that section 641 was not to be confined in its application to "the technical definition of the tort of conversion." 629 F.2d at 924.

The amicus *Washington Post*, though argues that the statute has "as an essential element a permanent or substantial deprivation of identifiable property interest," [31] and since the property right asserted by the government relates to "a possessory right to information or intellectual property," *Id.* at 42, section 641 is without application. Whether pure "information" constitutes property which may be the subject of statutory protection under section 641, a matter which has largely been clarified by the recent case of *Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed. 2275, 42 Cr.L.Rep. 3009 (November 16, 1987), is not, however, involved here. We are dealing with specific, identifiable tangible property, which will qualify as such for larceny or embezzlement under any possible definition of the crime of theft. The photographs and the reports were clearly taken illegally and by stealth and disposed of by the defendant to a third party for personal gain, both monetary and in request for a job. That would seem to represent a textbook application of the crime set forth in section 641.

The defendant would deny the application of the statute to his theft because he says that he did not steal the material "for private, covert use in illegal enterprises"

but in order to give it to the press for public dissemination and information. He claims that to criminalize his conduct under section 641 would be to invade his first amendment rights. The mere fact that one has stolen a document in order that he may deliver it to the press, whether for money or for other personal gain, will not immunize him from responsibility for his criminal act. To use the first amendment for such a purpose would be to convert the first amendment into a warrant for thievery. As the Supreme Court made clear in *Branzburg,* 408 U.S. 665, 92 S.Ct. 2646, the First Amendment may not be used for such a sordid purpose, either to enable the governmental employee to excuse his act of theft or to excuse him, as in *Snepp* and *Marchetti,* from his contractual obligation.

Actually, it may be noted parenthetically that the government contends, and the record affords substantial evidence in support of such contention, that the defendant in this case was not fired by zeal for public debate into his acts of larceny of government property; he was using the fruits of his theft to ingratiate himself with one from whom he was seeking employment. It can be said that he was motivated not by patriotism and the public interest but by self-interest.

The defendant's reference to *Pearson v. Dodd,* 410 F.2d 701 (D.C.Cir.1969), *cert. denied,* 395 U.S. 947, 89 S.Ct. 202, 23 L.Ed. 2d 465 (1969), and to *Dowling v. United States,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985) is misplaced. Those cases involved copying. The defendant's possession in both cases was not disturbed. This case does not involve copying; this case involves the actual theft and deprivation of the government of its own tangible property. We find no error in the conviction of the defendant under section 641.

## IV.

### Evidentiary Objections of the Defendant

Finally, we review the defendant's objections to the evidentiary rulings of the dis-

---

**31.** Brief of Amicus, Washington Post, et. al. at 41.

trict judge. In passing on such exceptions it must be borne in mind that "the appraisal of the probative and prejudicial value of evidence under Rule 403 is entrusted to the sound discretion of the trial judge; absent extraordinary circumstances, the Courts of Appeal will not intervene in its resolution." *United States v. MacDonald,* 688 F.2d 224, 227–28 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). Moreover, any error in admission or exclusion is subject to the harmless error test: "whether it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial." *United States v. Davis,* 657 F.2d 637, 640 (4th Cir.1981). Measured by these standards we find no reversible error in the district judge's evidentiary rulings.

■ The first evidentiary objection we consider was directed at the trial court's refusal to admit evidence on how many persons there were in government and under government contracts with a "Secret" classification. The trial judge ruled such evidence inadmissible. We find this ruling not erroneous. The point in this case was not how many people in government could have qualified for receipt of this information (*i.e.,* entitled to receive "Secret" material); the decisive point is that Derek Wood and *Jane's Defence Weekly,* the ones to whom the defendant transmitted the secret material in this case, did not have a "Secret" clearance and were thus, to the knowledge of the defendant, not qualified to receive the information. To have gone into all the evidence of the number of employees in the Government who had "Secret" clearances and the methods of issuing such classification and the limitations that were often attached to the issuance of such classification in particular cases would have cluttered the record with needless and irrelevant evidence, the only result of the introduction of which would have been to confuse the basic issues in this case. Moreover, the development of such evidence would likely have been extensive, covering various agencies and the methods of assigning clearances with various limitations by the various agencies and defense

contractors. The district judge acted properly in denying the introduction of such evidence.

■ The district judge also ruled that evidence of the foreign countries with whom the Government exchanged intelligence information and also evidence of possible countermeasures the Soviets had taken to counter the information derived by them from the disclosure of the materials in question here was inadmissible. There is no contention that any foreign government was responsible for the disclosure of the information which the defendant disclosed. Further, disclosure of the nations with whom we may have programs for the exchange of intelligence information would create grave and serious diplomatic concerns for us and would, without more, not suggest that, as a result of disclosure to any foreign government with whom we had confidential exchange of intelligence, the information involved here had become publicly known. Moreover, to require the Government to produce evidence of countermeasures by the Soviets would likely force the Government to disclose its ongoing intelligence operations in a critical area and might seriously compromise our intelligence-gathering capabilities. Such evidence would add little or nothing to defendant's defense but could be of great damage to our intelligence capabilities. We think the district judge correctly refused to be diverted into such excursions in the presentation of evidence which offered no particular benefit to defendant's defense but which would pose the likelihood of grave injury to our national interests.

■ The defendant sought to introduce into evidence the testimony of two newspaper reporters that an employee in the Executive Branch of the Government had leaked "to them the information in *Jane's Defence Weekly,* involved in this prosecution. The catch to their testimony was that they would refuse to identify their source. A ruling was requested allowing them to refuse to answer an inquiry on the source of the alleged disclosure on cross-examination. The district judge ruled that, if the

defendant intended to offer such testimony, the Government would be given the right to require the witnesses to identify on cross-examination their informant. In essence, the defendant sought to develop through the testimony of these witnesses that some of the information on which the prosecution was based had been disclosed by an employee in the Executive Branch but the Government was to be denied the right to the name of the so-called "leaker" so that it could test the correctness of the testimony. We agree with the district judge that, if the defendant wished to use such witnesses, he had to afford the Government the opportunity to rebut the testimony and the Government could do this only if given the name of the informant. There was no other way the Government could rebut such testimony.

 Another objection of the defendant is directed at the district judge's disallowance of the question on the defendant's "patriotism, his devotion to a strong navy, and his propensity not to do anything potentially damaging to the United States or advantageous to a foreign power." [32] He identifies in his brief in this court the evidence he wished to introduce in this area. Such evidence consisted of the testimony of two witnesses, *i.e.*, that of witnesses Jackson, who was the managing director of Jane's Publishing Company, and Derek Wood, the editor of *Jane's Defence Weekly*. Both lived in England; neither of these witnesses had an intimate relationship with Morison. Their contacts personally with the defendant were rare and abbreviated; there was, however, correspondence between them and Mr. Morison. It was not a "lot" since the correspondence between Morison and *Jane's* was generally with Captain Moore, another employee of *Jane's*. Their testimony related basically to their correspondence with the defendant in the latter's capacity as their American "stringer" whose material was used by *Jane's* under an agreement between *Jane's* and the defendant. The defendant was paid for these services as his material sent

to *Jane's* was accepted and published in one of *Jane's* publications. Jackson testified, primarily on the basis of the material *Jane's* accepted from the defendant, that he had never "seen him [i.e., the defendant] suggest anything or do anything that would suggest a lack of commitment to the best interests of the United States" (App. at 693) and that he had never seen him "do anything against the best interests of the United States" (App. at 721). In a leading question that offended the rule against leading questions, Jackson was asked by defendant's counsel

Q: And he [referring to the defendant] is a patriot of the first rank, would you agree?

A: Yes.[33]

Jackson, though, testified categorically that his company did not "knowingly publish classified information" and it did not "because there would be a reason, first of all, why they would have been classified and secondly, because we work on the basis of trust." [34] Finally, Mr. Jackson was asked this clincher:

Q. Assuming that the jury in this case concludes beyond a reasonable doubt that the defendant Samuel L. Morison is the person who furnished the photographs to *Jane's Defence Weekly*—and by "the photographs," I'm referring to Government Exhibits 1–A, 1–B and 1–C —and assuming further that the jury finds beyond a reasonable doubt that the photographs were classified at the time, and assuming further that this jury finds beyond a reasonable doubt that the defendant knew they were classified at the time, and assuming further that this jury finds beyond a reasonable doubt that the defendant had no authorization to furnish notices, furnish those photographs to you, would you conclude that his furnishing of those photographs was in the best interests of the United States?

MR. MUSE: Objection.

A: That's a multipart question. I will try to remember what you said. If those

---

**32.** Brief for Appellant at 50.

**33.** App. at 671.

**34.** Appendix at 722.

photographs were not authorized for release, he knew they were not authorized for release, then I have to conclude that he's not acting in the best interest of the United States.

The district court struck all this testimony, including the very damaging testimony of Jackson that the defendant's conduct as it was conclusively proved in the case was "against the best interests of the United States." In striking all this testimony the district court filed a written opinion incorporating his ruling, which opinion is published in 622 F.Supp. 1009. We are satisfied with the district court's reasoning and decision on this point. We may add that, had the district court retained in the record all the evidence on this point, including Jackson's final opinion on the conduct of the defendant for which he was being tried, the result would have clearly been far more harmful to defendant's defense than helpful. Under those circumstances, it could not be said that the striking of such testimony "could have affected the verdict reached by the particular jury" in this case. *See United States v. Davis, supra.*

■ Finally, the defendant complains in his brief of what he says was the district court's refusal to qualify the witness Anderson as an expert, entitled to give opinions that the *Weekly Wires* and the photographs were not potentially damaging, that the *Weekly Wires* were not worth more than $100 and would have contradicted in some way the rebuttal testimony of Hazzard and Kerr.[35] This was not, however, the ground on which the defendant at trial proffered Anderson as an expert witness. At that time, he said that he was offering Anderson as an expert on "the use and analysis of intelligence information concerning Soviet military matters," and the district court's ruling in response to this proffer was that Anderson would be "accepted as a facts witness relating to these matters."[36] And Anderson was permitted to testify that it was his opinion with his background of experience that the

materials in question had "not told the Soviets anything that they did not already know"[37] and that such materials did not "reveal anything about our intelligence collection capabilities that [was] not otherwise known to the public [which would include, of course the Soviet Union]".[38] Moreover, the defendant offered three expert witnesses—Inslow, Pike and Richelson—on the "analysis of intelligence information concerning Soviet military matters." Even had Anderson been accepted as an expert, his testimony on the matters for which he was proffered by the defendant as an expert witness on would have clearly been simply cumulative. So far as any contention that Anderson qualified as a witness on the monetary value of the information disclosed, it is important to note two facts: first, the defendant was never proffered as a witness on value; and, second, the defendant made no showing of any qualification of Anderson to testify as an expert on the value of the material. We accordingly find no reversible error in the rulings of the district court in this regard.

### Conclusion

Having reviewed all of the defendant's claims of error herein and found them without merit, we affirm the judgment of conviction of the defendant herein.

*AFFIRMED.*

WILKINSON, Circuit Judge, concurring:

I concur in Judge Russell's opinion. I believe his analysis of the relevant statutes, instructions, and evidentiary rulings is both careful and correct.

Morison's constitutional challenge is specifically phrased in terms of notice, statutory vagueness, and overbreadth. Yet much of the argument in this case has been cast in broader terms. Amici, *The Washington Post*, et al., warn that this case "will affect, and perhaps dramatically al-

---

**35.** Brief at 48–49.

**36.** Appendix at 961.

**37.** App. at 966.

**38.** Appendix at 969.

ter, the way in which government officials deal with the press, the way in which the press gathers and reports the news, and the way in which the public learns about its government." The news organizations are necessarily raising their concerns as amici, not as parties. No member of the press is being searched, subpoenaed, or excluded, as in a typical right of access case. Morison as a source would raise newsgathering rights on behalf of press organizations that are not being, and probably could not be, prosecuted under the espionage statute.

Perhaps because these press rights of access are not personal to Morison, we have thus been asked to import a weighty assortment of First Amendment values into Morison's notice, vagueness, and overbreadth claims. Although this is more freight than the Supreme Court has lately allowed these doctrines to carry, I would assume for purposes of this discussion that Morison is entitled to raise the serious claims urged by the press amici. Indeed, I cannot fully express my own view of this case without addressing these claims, not as unspoken aspects of a vagueness and overbreadth analysis, but directly and on their own terms.

### I.

I do not think the First Amendment interests here are insignificant. Criminal restraints on the disclosure of information threaten the ability of the press to scrutinize and report on government activity. There exists the tendency, even in a constitutional democracy, for government to withhold reports of disquieting developments and to manage news in a fashion most favorable to itself. Public debate, however, is diminished without access to unfiltered facts. As James Madison put it in 1822: "A popular Government, without popular information, or a means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." 9 Writings of James Madison 103 (G. Hunt ed. 1910). We have placed our faith in knowledge, not in ignorance, and for most, this means reliance on the press. Few Americans are acquainted with those who make policy,

fewer still participate in making it. For this reason, the press provides the "means by which the people receive that free flow of information and ideas essential to effective self-government." *Saxbe v. Washington Post Co.*, 417 U.S. 843, 863, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting).

The First Amendment interest in informed popular debate does not simply vanish at the invocation of the words "national security." National security is public security, not government security from informed criticism. No decisions are more serious than those touching on peace and war; none are more certain to affect every member of society. Elections turn on the conduct of foreign affairs and strategies of national defense, and the dangers of secretive government have been well documented. Morison claims he released satellite photographs revealing construction of the first Soviet nuclear carrier in order to alert the public to the dimensions of a Soviet naval buildup. Although this claim is open to serious question, the undeniable effect of the disclosure was to enhance public knowledge and interest in the projection of Soviet sea power such as that revealed in the satellite photos.

The way in which those photographs were released, however, threatens a public interest that is no less important—the security of sensitive government operations. In an ideal world, governments would not need to keep secrets from their own people, but in this world much hinges on events that take place outside of public view. Intelligence gathering is critical to the formation of sound policy, and becomes more so every year with the refinement of technology and the growing threat of terrorism. Electronic surveillance prevents surprise attacks by hostile forces and facilitates international peacekeeping and arms control efforts. Confidential diplomatic exchanges are the essence of international relations.

None of these activities can go forward without secrecy. When the identities of our intelligence agents are known, they may be killed. When our electronic surveillance capabilities are revealed, countermea-

sures can be taken to circumvent them. When other nations fear that confidences exchanged at the bargaining table will only become embarrassments in the press, our diplomats are left helpless. When terrorists are advised of our intelligence, they can avoid apprehension and escape retribution. *See generally* Note, 71 Va.L.Rev. 801, 801–03 (1985) (citing numerous leaks that have compromised a major covert salvage operation, exposed the development of the secret Stealth aircraft, and stymied progress on an international treaty). The type of information leaked by Morison may cause widespread damage by hampering the effectiveness of expensive surveillance systems which would otherwise be expected to provide years of reliable information not obtainable by any other means.

Public security can thus be compromised in two ways: by attempts to choke off the information needed for democracy to function, and by leaks that imperil the environment of physical security which a functioning democracy requires. The tension between these two interests is not going to abate, and the question is how a responsible balance may be achieved.

## II.

Courts have long performed the balancing task where First Amendment rights are implicated. The Supreme Court has often had to balance the value of unrestricted newsgathering against other public interests. *See, e.g., Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (access to judicial proceedings); *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed. 2d 525 (1978) (search of newspaper office); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1971) (disclosure of press sources to grand jury). "[A] fair reading of the majority's analysis in *Branzburg* makes plain that the result hinged on an assessment of the competing societal interests involved in that case rather than on any determination that First Amendment freedoms were not implicated." *Saxbe,* 417 U.S. at 859–60, 94 S.Ct. at 2819 (Powell, J., dissenting). In these cases the courts have taken an "aggressive" balancing role, directly comparing the interest served by restraints on the press with the interest in unhindered newsgathering.

Although aggressive balancing may have characterized the judicial role in other contexts, I am not persuaded that it should do so here. In the national security field, the judiciary has performed its traditional balancing role with deference to the decisions of the political branches of government. Presented with First Amendment, Fourth Amendment, and other constitutional claims, the Court has held that government restrictions that would otherwise be impermissible may be sustained where national security and foreign policy are implicated. *See, e.g., Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). In the terminology associated with a balancing analysis, "the Government has a compelling interest in protecting ... the secrecy of information important to our national security." *Haig v. Agee,* 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981) (*quoting Snepp,* 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3). Recognition of such a compelling state interest reflects an understanding of the institutional limitations of the judiciary and a regard for the separation of powers.

The aggressive balancing that courts have undertaken in other contexts is different from what would be required here. The government's interest in the security of judicial proceedings, searches by law enforcement officers, and grand jury operations presented in *Richmond Newspapers, Zurcher,* and *Branzburg* are readily scrutinized by courts. Indeed, they pertain to the judiciary's own systems of evidence. Evaluation of the government's interest here, on the other hand, would require the judiciary to draw conclusions about the operation of the most sophisticated electronic systems and the potential effects of their disclosure. An intelligent inquiry of this sort would require access to the most sensitive technical information, and background knowledge of the range of intelligence operations that cannot easily be presented in the single "case or controversy" to which

courts are confined. Even with sufficient information, courts obviously lack the expertise needed for its evaluation. Judges can understand the operation of a subpoena more readily than that of a satellite. In short, questions of national security and foreign affairs are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948); *see Agee*, 453 U.S. at 292, 101 S.Ct. at 2774.

The balancing process must thus accord Congress latitude to control access to national security secrets by statute and the executive some latitude to do so through the classification scheme. I do not come to this conclusion solely because the enumerated powers for the conduct of foreign affairs are lodged in the executive and legislative branches. The First Amendment presupposes that the enumerated powers—the raising of armies no less than the raising of revenue—will be executed in an atmosphere of public debate. I also recognize that the democratic accountability of the legislature and executive is not a wholly satisfactory explanation for deference in the area of national security secrets. Years may pass before the basis of portentous decisions becomes known. The public cannot call officials to account on the basis of material of whose existence and content it is unaware. What is more, classification decisions may well have been made by bureaucrats far down the line, whose public accountability may be quite indirect.

Rather, the judicial role must be a deferential one because the alternative would be grave. To reverse Morison's conviction on the general ground that it chills press access would be tantamount to a judicial declaration that the government may never use criminal penalties to secure the confidentiality of intelligence information. Rather than enhancing the operation of democracy, as Morison suggests, this course would install every government worker with access to classified informa-tion as a veritable satrap. Vital decisions and expensive programs set into motion by elected representatives would be subject to summary derailment at the pleasure of one disgruntled employee. The question, however, is not one of motives as much as who, finally, must decide. The answer has to be the Congress and those accountable to the Chief Executive. While periods of profound disillusionment with government have brought intense demands for increased scrutiny, those elected still remain the repositories of a public trust. Where matters of exquisite sensitivity are in question, we cannot invariably install, as the ultimate arbiter of disclosure, even the conscience of the well-meaning employee.

### III.

The remaining question, then, is whether the application of this particular law to this particular defendant took place in accordance with constitutional requirements. For the reasons so carefully analyzed in Judge Russell's opinion, I am persuaded that it did. Neither Morison's due process claims concerning notice and vagueness nor his First Amendment overbreadth argument supports reversal of his convictions.

Morison's claim that he was not on notice that his conduct might lead to prosecution is unpersuasive. Morison was a trained national intelligence officer with a Top Secret security clearance. He signed a disclosure agreement specifically stating that criminal prosecution could result from mishandling of secret information, and he clipped explicit classification warnings from the borders of the satellite photographs before sending them to *Jane's*. Morison cannot use the fact that prosecutions under the espionage statute have not been frequent to shield himself from the notice provided by these facts and the clear language of the statute.

The careful limiting instructions given by the district court suffice to cure any vagueness in sections 793(d) and (e). The district court's definition of "relating to the national defense" and of the scienter requirement in the statute are consistent with our hold-

ings in *United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir.1980), and *United States v. Dedeyan,* 584 F.2d 36 (4th Cir.1978). The district court's definition of "entitled to receive" by reference to the classification scheme is both logical and supported by precedent. *See, e.g., Truong,* 629 F.2d at 919 n. 10. Vagueness that might exist around the edges of these statutes does not absolve conduct at the core of the statutory proscription. *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974).

Morison's contention that potential future applications of the espionage statute to other sources render it invalid as to him is not, ultimately, persuasive. Amici, *The Washington Post,* et al., describe various press reports of illegal domestic surveillance by the CIA, design defects of the Abrams M–1 tank, Soviet arms control violations, and military procurement cost overruns. Amici contend that if the sources of such reports face prosecution under hypothetical applications of the statute, then "corruption, scandal, and incompetence in the defense establishment would be protected from scrutiny."

As the above examples indicate, investigative reporting is a critical component of the First Amendment's goal of accountability in government. To stifle it might leave the public interest prey to the manifold abuses of unexamined power. It is far from clear, however, that an affirmance here would ever lead to that result. The Supreme Court has cautioned that to reverse a conviction on the basis of other purely hypothetical applications of a statute, the overbreadth must "not only be real, but substantial as well." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). I question whether the spectre presented by the above examples is in any sense real or whether they have much in common with Morison's conduct. Even if juries could ever be found that would convict those who truly expose governmental waste and misconduct, the political firestorm that would follow prosecution of one who exposed an administration's own ineptitude would make such prosecutions a rare and unreal-

istic prospect. Because the potential overbreadth of the espionage statute is not real or substantial in comparison to its plainly legitimate sweep, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.* at 615–16, 93 S.Ct. at 2918. On the facts of Morison's case, I agree with Judge Russell's conclusion that the limiting instructions given by the district court were sufficient.

It is through notice, vagueness, and overbreadth analysis that the judiciary effectuates the interests of the First Amendment in cases where classical balancing does not take place. The notice requirement insures that speakers will not be stifled by the fear they might commit a violation of which they could not have known. The district court's limiting instructions properly confine prosecution under the statute to disclosures of classified information potentially damaging to the military security of the United States. In this way the requirements of the vagueness and overbreadth doctrines restrain the possibility that the broad language of this statute would ever be used as a means of punishing mere criticism of incompetence and corruption in the government. Without undertaking the detailed examination of the government's interest in secrecy that would be required for a traditional balancing analysis, the strictures of these limiting instructions confine prosecution to cases of serious consequence to our national security. I recognize that application of the vagueness and overbreadth doctrines is not free of difficulty, and that limiting instructions at some point can reconstruct a statute. In this case, however, the district court's instructions served to guarantee important constitutional safeguards without undermining the legitimate operation of the statute.

### IV.

It may well be, as the government contends, that Morison released the satellite photos and weekly wires in order to receive cash and ingratiate himself with *Jane's* to

gain future employment. But I do not think that Morison's motives are what is crucial here. Morison's conduct has raised questions of considerable importance. At the same time, it is important to emphasize what is *not* before us today. This prosecution was not an attempt to apply the espionage statute to the press for either the receipt or publication of classified materials. *See New York Times Co. v. United States*, 403 U.S. 713, 714–63, 91 S.Ct. 2140, 2141–66, 29 L.Ed.2d 822 (1971) (separate opinions expressing the views of the Justices on such applications of the espionage statute). Neither does this case involve any prior restraint on publication. *Id.* Such questions are not presented in this case, and I do not read Judge Russell's opinion to express any view on them.

The parties and amici have presented to us the broader implications of this case. We have been told that even high officials routinely divulge classified public secrets, that alternative sanctions may be imposed on such behavior, and that an affirmance here presents a vital threat to newsgathering and the democratic process. On the other side of the argument lies the commonsense observation that those in government have their own motives, political and otherwise, that ensure the continuing availability of press sources. "The relationship of many informants to the press is a symbiotic one." *Branzburg*, 408 U.S. at 694, 92 S.Ct. at 2663. Problems of source identification and the increased security risks involved in discovery and trial make proceedings against press sources difficult. Moreover, the espionage statute has no applicability to the multitude of leaks that pose no conceivable threat to national security, but threaten only to embarrass one or another high government official.

What Justice Potter Stewart once said in an address to the Yale Law School has meaning here:

> So far as the Constitution goes, the autonomous press may publish what it knows, and may seek to learn what it can.
>
> But this autonomy cuts both ways. The press is free to do battle against

secrecy and deception in government. But the press cannot expect from the Constitution any guarantee that it will succeed. There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. . . .

> The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolution, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society.

Stewart, *"Or of the Press"*, 26 Hastings L.J. 631 (1975).

What is at issue in this case is the constitutionality of a particular conviction. As to that, I am prepared to concur with Judge Russell that the First Amendment imposes no blanket prohibition on prosecutions for unauthorized leaks of damaging national security information, and that this particular prosecution comported with constitutional guarantees.

JAMES DICKSON PHILLIPS, Circuit Judge, concurring, specially:

I concur in the judgment and, with only one reservation, in Judge Russell's careful opinion for the court. My reservation has to do only, but critically, with that opinion's discussion of the first amendment issues raised by the defendant. While these are ultimately discussed and rejected, there are earlier suggestions that as applied to conduct of the type charged to Morison, the Espionage Act statutes simply do not implicate any first amendment rights. On that point, I agree with Judge Wilkinson's differing view that the first amendment issues raised by Morison are real and substantial and require the serious attention which his concurring opinion then gives them. I therefore concur in that opinion.

If one thing is clear, it is that the Espionage Act statutes as now broadly drawn are unwieldy and imprecise instruments for prosecuting government "leakers" to the press as opposed to government "moles" in the service of other countries. Judge Wil-

kinson's opinion convincingly demonstrates that those statutes can only be constitutionally applied to convict press leakers (acting for whatever purposes) by limiting jury instructions which sufficiently flesh out the statutes' key element of "relating to the national defense" which, as facially stated, is in my view, both constitutionally overbroad and vague. Though the point is to me a close one, I agree that the limiting instruction which required proof that the information leaked was either "potentially damaging to the United States or might be useful to an enemy" sufficiently remedied the facial vice. Without such a limitation on the statute's apparent reach, leaks of information which, though undoubtedly "related to defense" in some marginal way, threaten only embarrassment to the official guardians of government "defense" secrets, could lead to criminal convictions. Such a limitation is therefore necessary to define the very line at which I believe the first amendment precludes criminal prosecution, because of the interests rightly recognized in Judge Wilkinson's concurring opinion. This means, as I assume we reaffirm today, that notwithstanding information may have been classified, the government must still be required to prove that it was *in fact* "potentially damaging ... or useful," i.e., that the fact of classification is merely probative, not conclusive, on that issue, though it must be conclusive on the question of authority to possess or receive the information. This must be so to avoid converting the Espionage Act into the simple Government Secrets Act which Congress has refused to enact.

Here, were we writing on a clean slate, I might have grave doubts about the sufficiency of the limiting instruction used in Morison's trial. The requirement that information relating to the national defense merely have the "potential" for damage or usefulness still sweeps extremely broadly. One may wonder whether any information shown to be related somehow to national defense could fail to have at least some such "potential." But we do not write on an absolutely clean slate, for this instruction has been approved by this court in both *Dedeyan* and *Truong Dinh Hung* as

an appropriately limiting one in application of these and related sections of the Espionage statute. While both of those applications were to "classic spy" conduct, the precedential effect of those decisions cannot be disregarded.

Judge Wilkinson expresses the view that because judicious case-by-case use of appropriate limiting instructions is available, "the espionage statute has no applicability to the multitude of leaks that pose no conceivable threat to national security, but threaten only to embarrass one or another high government official." On this basis he concludes that these statutes can properly be applied to press leakers (whether venally or patriotically or however motivated) without threatening the vital newsgathering functions of the press. He supports this with a convincing discussion of the practical dynamics of the developed relationship between press and government officials to bolster his estimate that this use of the statute will not significantly inhibit needed investigative reporting about the workings of government in matters of national defense and security.

By concurring in his opinion, I accept that general estimate, which I consider to be the critical judicial determination forced by the first amendment arguments advanced in this case. But in doing so, I observe that jury instructions on a case-by-case basis are a slender reed upon which to rely for constitutional application of these critical statutes; and that the instructions we find necessary here surely press to the limit the judiciary's right and obligation to narrow, without "reconstructing," statutes whose constitutionality is drawn in question.

In the passage quoted by Judge Wilkinson, Justice Stewart observed that "Congress may provide a resolution ... through carefully drawn legislation." That surely would provide the better long-term resolution here.