**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard Lee FOWLER, Defendant–Appellant.**

**No. 90–5607.**

United States Court of Appeals, Fourth Circuit.

Argued October 4, 1990.

Decided April 29, 1991.

---

Joseph M. Jones, argued Schwalb, Donnenfeld, Bray & Silbert, P.C. (John M. Bray, Cary M. Feldman, James S. Cohen, Schwalb, Donnenfeld, Bray & Silbert, P.C., on brief), Washington, D.C., for defendant-appellant.

Maury S. Epner, argued, Sp. Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., Randy I. Bellow, Asst. U.S. Atty., on brief), Alexandria, Va., for plaintiff-appellee.

Before ERVIN, Chief Judge, BUTZNER, Senior Circuit Judge, and NICKERSON, U.S. District Judge for the District of Maryland, sitting by designation.

BUTZNER, Senior Circuit Judge:

Richard L. Fowler appeals from his convictions for conversion and unauthorized conveyance of classified documents in violation of 18 U.S.C. § 641, mail fraud in violation of 18 U.S.C. § 1341, and conspiracy to violate §§ 641 and 1341. Fowler argues the district court erred in three broad areas: its decision on the applicability of § 641, its rulings on numerous evidentiary matters, and its jury instructions. Finding no reversible error, we affirm.

I

The Department of Defense employed Fowler in a civilian capacity for 26 years. When he retired, Boeing Aerospace Co. hired him as a senior marketing analyst. While working for the government and for Boeing, Fowler had a "secret" security clearance from the government. As required by both the Department and Boeing for security clearance, Fowler signed statements acknowledging that he understood the pertinent requirements for handling

classified information as set out in the Department's Industrial Security Manual.

Fowler obtained secret documents from the Department of Defense and the National Security Council and delivered them to Boeing either personally or by mail. He also furnished copies of some of the documents to other defense contractors' employees, whom the government identified as unindicted coconspirators. Fowler converted some of the documents by extracting secret information and incorporating it into his unclassified activity reports to Boeing. Neither Fowler, nor Boeing, nor anyone to whom Fowler supplied copies was authorized to receive them.

The Department's documents dealt with its Program, Planning, and Budget System. They included papers disclosing strategy and the kinds of weapons that should be procured to implement that strategy. They also included a five-year projection of the budget and programming decisions. The National Security Council documents pertained to the Strategic Defense Initiative. Each of these documents was classified secret and cost more than $100 to prepare.

When an investigator questioned Fowler about his unclassified activity reports containing classified information excerpted from secret documents, Fowler denied that the information was classified. Later he acknowledged that the document was classified, but he said the information he copied from the document was not classified. Confronted by a comparison of the documents with his reports, Fowler also said the information was overclassified, classified for political reasons, and not classified for national security purposes. Fowler, however, did not have authority to possess, declassify, or copy these secret documents. Additionally, an assistant secretary of defense testified that the documents were not misclassified and that disclosure of the material could have an impact on national security. The jurors could draw their own conclusions about the conflict between Fowler's statement and the witness's testimony, because they saw pertinent parts of the secret documents and Fowler's reports.

It was an unspoken rule among Fowler's coconspirators not to ask each other to identify sources of secret documents. Fowler did not testify, but during the investigation he initially claimed he could not remember who gave him the documents. Later he admitted he remembered, but he refused to name his source.

## II

Section 641 provides that whoever "knowingly converts to his own use or the use of another, or without authority ... conveys ... any record ... or thing of value of the United States" is guilty of a felony if the value of the property exceeds $100.

Fowler moved to dismiss counts 2–24 of the indictment, arguing that § 641 does not punish the acquisition or dissemination of classified information. Counts 2–19 charged that Fowler without authority conveyed to Boeing records and documents, in violation of § 641. Counts 20–24 charged that Fowler converted to his own use and the use of another records of the United States by extracting information from each document and inserting it in his activity reports in violation of § 641. Fowler emphasized that he did not acquire the original documents but only copies of them. He distinguishes between a document and the information contained in the document. It follows, he says, that because the government did not copyright the information, it cannot be a thing of value owned by the government within the meaning of § 641. He urges us to adopt the separate view expressed by Judge Winter in *United States v. Truong Dinh Hung*, 629 F.2d 908, 923–28 (4th Cir.1980). He also relies on *United States v. Tobias*, 836 F.2d 449, 450–51 (9th Cir.1988). In *Truong Dinh Hung*, Judge Winter, without concurrence of other members of the court, wrote that Congress did not intend § 641 to apply to the theft of government information. *Tobias* held that § 641 did not apply to intangible property, including classified government information.

Fowler was not charged with conveying abstract information. He was charged

with conveying and converting documents, which, although copies, were things of value and tangible property of the United States. True, the documents contain information, but this fact does not deprive them of their qualities as tangible property and things of value. Previously we held that § 641 applies to the conversion of secret navy documents and photographs. *United States v. Morison*, 844 F.2d 1057, 1076–77 (4th Cir.1988). *Morison* provides sound precedent for affirming the district court's denial of Fowler's motion to dismiss the indictment.

Moreover, in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the intangible nature of a newspaper's confidential business information did not "make it any less 'property' protected by the mail and wire fraud statutes." 484 U.S. at 25, 108 S.Ct. at 320. For this reason, even if we were to accept Fowler's theory that the indictment essentially charged only the conveyance and conversion of information, § 641 would apply because information is a species of property and a thing of value. We agree with the Second and Sixth Circuits that conversion and conveyance of governmental information can violate § 641. *United States v. Jeter*, 775 F.2d 670, 680–82 (6th Cir.1985); *United States v. Girard*, 601 F.2d 69, 70–71 (2d Cir.1979).

### III

■ Fowler's counsel, having received appropriate security clearance, inspected the classified documents specified in the indictment. Fowler then gave notice pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C.App. IV § 5, for disclosure of the classified information in the documents. He contends that the contents of the documents were relevant to show lack of specific intent, explain his statements to investigators, provide for effective cross examination, show that the documents had a value of less than $100, establish his belief that Boeing had a need to know the information, prove that Boeing gained no competitive advantage, and show that these kinds of documents were available to other contractors.

The government opposed disclosing the contents of the documents on the ground that the contents were irrelevant. The prosecutor also explained that he would prove value by showing the cost of preparing the documents without relying on their intrinsic value.

*United States v. Zettl*, 889 F.2d 51 (4th Cir.1989), governs this aspect of the case. Zettl, an employee of a defense contractor, was charged with conveying classified navy budget documents without authority in violation of § 641. We held that Zettl was not entitled to introduce into evidence the contents of the classified documents and that defenses similar to those pressed by Fowler were irrelevant.

After a pretrial hearing conducted pursuant to CIPA § 6(a), the district court denied Fowler's request. The court held that Fowler did not need the contents of the documents to defend himself. The court subsequently modified one aspect of its ruling. It recognized that "substantial interference with government property rights" was an element of conversion. It permitted the introduction of the contents of the documents mentioned in the conversion counts and properly instructed the jury on this issue.

The district court did not err by denying disclosure of the contents of the secret documents mentioned in the conspiracy, conveyance, and mail fraud counts. The evidence disclosed the general nature of the secret documents, but their contents—the budget figures, budget projections, and details of proposed plans—were not relevant to Fowler's defense.

### IV

Fowler assigns error to the district court's denial of discovery and his applications for subpoenas duces tecum, which he sought pursuant to Fed.R.Crim.P. 17(c). Fowler contends that because the court erred regarding the availability of a good faith defense, we must review denial of his motions *de novo*.

■ The district court committed no error of law regarding a good faith defense—an issue we discuss in more detail in part VI *infra*. We therefore review the district court's denial of Fowler's requests for discovery under the familiar standard of abuse of discretion. *See United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Tindle*, 808 F.2d 319, 323 (4th Cir.1986).

Among the items Fowler's discovery motion requested were any and all classified documents relating to information given to contractors, "need to know" determinations, government enforcement activities, government classified libraries, sensitive and proprietary Department of Defense financial information, competitive advantage, evidence of confusion, and a "copy of the President's budget and all supporting information memoranda made available to the public or to contractors for the years 1978–1985."

The district court carefully analyzed Fowler's discovery requests. It noted that the government had agreed to provide statements Fowler made to Boeing and government agents, statements of unindicted coconspirators whom the government expected to call as witnesses, and, on a reciprocal basis, a list of documents it proposed to use at the trial.

In agreement with the district court, we conclude that the government adequately provided the material required by Fed.R. Crim.P. 16 and the Jencks Act. Items that the district court did not require the government to furnish were immaterial to the issues in the case and not subject to discovery under Rule 16. The court's denial of the discovery motion was not an abuse of discretion.

■ Closely related to Fowler's discovery motion was his application for subpoenas duces tecum. Fowler sought to subpoena the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, and the Army Inspector General. Among the documents he requested were the Defense Investigative Service's audits of other contractors, materials relating to governmental investigations, studies of the classified document system, and materials reflecting the acquisition and possession of budgetary documents by other defense contractors.

Fowler's claim that Boeing needed to know information in classified documents that it was not authorized to receive is not a defense to the charge of conveying secret documents without authority or extracting their contents for unclassified reports. The district court correctly ruled that information showing other defense contractors were trafficking in the Department's classified documents was irrelevant to Fowler's defense. Moreover, as the evidence unfolded at the trial, Fowler had no need to subpoena information about widespread dissemination of secret documents. The record is replete with testimony from coconspirators that Fowler, his coconspirators, and other persons whom they knew were busy trading secret documents that they were not authorized to possess. Fowler, himself, contributed much to this pervasive illegal activity. For example, when one of his coconspirators complained that he could not get from the Department a secret document, Fowler readily obtained it for him from a source Fowler has consistently declined to identify.

The quality and extent of the Department's enforcement of its security regulations against other defense contractors were also irrelevant. Department investigators' misplaced belief that contractors would not betray the trust reposed in them could not justify Fowler's role in this betrayal.

Fowler must show that the material he sought met the requirements of relevancy, admissibility, and specificity. *United States v. Nixon*, 418 U.S. at 700, 94 S.Ct. at 3103. This he failed to do. The district court aptly observed that the application was little more than a duplication of Fowler's discovery motion. Rule 17(c), which governs the issuance of subpoenas duces tecum, is not a discovery device. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S.Ct. 675, 678, 95 L.Ed. 879 (1951). We conclude that the district court did not

abuse its discretion by denying the application for subpoenas duces tecum.

## V

■ Fowler assigns numerous errors to the court's evidentiary rulings. In general he complains that the court deprived him of a fair trial by admitting the government's evidence and excluding his evidence on the same issues. In support of this general allegation he refers to numerous specific rulings. He complains that the government unnecessarily called high ranking officials—a former Deputy Secretary of Defense, and several generals—for the purpose of unduly exaggerating the seriousness of the crime.

A review of the transcript discloses that this contention is without merit. The government needed to call several officials because no one of them was responsible for all 110 documents. Each official testified about each document that fell within the scope of his employment, explaining that he was in charge of the preparation of the document, it cost more than $100 to prepare, it was properly classified "secret," he authorized no one in the Department to deliver the document to Fowler, Boeing, or any other defense contractor, and no one authorized Fowler to convey the document to any contractor.

With the exception of the documents Fowler converted, the witnesses did not disclose the contents of the documents other than to explain in general terms their use in planning, procurement, and budget. Contrary to Fowler's assertion of unfair treatment, the district court did not allow government witnesses to discuss the contents of documents that the court had excluded in its CIPA ruling. The excerpts of secret documents Fowler converted were introduced into evidence. Fowler had ample opportunity to examine the witness with regard to these documents, their classification, and their contents.

■ Over Fowler's objection the court permitted three of the officials to express their opinions that a person with Fowler's experience in the Department would know the rules about classified budget doc-

uments and that these documents were not available to contractors. Although only one of these officials knew Fowler, the evidence was admissible. Federal Rule of Evidence 701 allows a lay witness to testify about his opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." The witnesses laid an adequate foundation for their testimony. Each was familiar with the documents in issue, their secret classification, the reason for their classification, the nature of Fowler's work in the Department, and the fact that people with his experience knew the Department did not authorize contractors to possess the documents. Their opinions were helpful to the jury in determining the nature and extent of Fowler's knowledge about the documents and whether he acted through negligence, accident, inadvertence, mistake, or confusion. *Cf. United States v. Smith*, 550 F.2d 277, 281 (5th Cir.1977). Since the opinions satisfied the requirements of Rule 701, the district court did not abuse its discretion by admitting them. *See United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir.1980). Furthermore, evidence that Fowler signed statements attesting to his knowledge of the Department's classification rules corroborates the opinions.

■ Throughout the trial Fowler sought to bolster his defense of lack of intent by showing that the Defense Investigative Service frequently inspected Boeing without complaining about unauthorized documents in the files. From the lack of complaint, Fowler sought to draw the inference that the investigators knew what was being done and that the contents of the documents were not "earthshaking." Fowler complains that the court repeatedly prevented him from posing questions about the investigators' "collective understanding."

The court excluded argumentative questions that defense counsel asked witnesses who were not familiar with the work and "understanding" of the Department's in-

vestigators. But when officials responsible for the investigation testified, the court allowed defense counsel ample latitude in their cross-examinations. The court correctly ruled that the investigators' failure to discover and complain about Boeing's possession of unauthorized documents was not a defense that would exonerate Fowler. Nevertheless, the court allowed Fowler to pursue the theory that because the investigators didn't complain, he believed he was doing no wrong, and therefore he lacked specific intent to violate § 641.

The evidence fully disclosed the facts relevant to this aspect of Fowler's defense. Many Boeing employees had "secret" security clearances. The Department authorized the company to possess many secret documents that officials of the Department concluded Boeing needed to know in performing its military contracts. Initially Boeing kept two classified document libraries—one for authorized documents that were available for inspection, the other for unauthorized documents that were not available for inspection. Later, Boeing combined the libraries, and the unauthorized documents that Fowler subsequently delivered were placed with the authorized documents.

The investigators usually gave about 10 days notice of scheduled inspections. After Boeing used the classified documents, it routinely destroyed them according to approved security practices. Of the approximately 1,300 unauthorized documents Fowler got for Boeing, only about 51 were not destroyed before any inspection. A few of them remained in the files for each inspection along with authorized documents. For many years the investigators did not detect that some of the documents were unauthorized. In closing argument Fowler's counsel asserted that this evidence showed Fowler had no intent to break the law. No ruling of the court impeded presentation of this defense.

Fowler also sought to support his defense of lack of intent by claiming that the Department's rules governing contractors' access to secret documents were vague and confusing. He contends that the court denied him a fair trial because it admitted the government's evidence of lack of confusion and excluded his evidence of confusion. The government's evidence on the subject was primarily the testimony of Department officials that we previously summarized and the testimony of some of Fowler's co-conspirators.

■ Fowler assigns error to the court's exclusion of excerpts taken from the following government reports: *Oversight of DOD's Management of Inside Information in the Acquisition Process: Hearing Before the Subcomm. on Oversight of Government Management of the Committee on Governmental Affairs*, 101st Cong., 1st Sess. (1989) (Levin Report); Commission to Review DOD Security Policies and Practices, *Keeping the Nation's Secrets* (Nov. 19, 1985); Department of Defense Industrial Security Review Comm., *Analysis of the Effectiveness of the Department of Defense Industrial Security Program and Recommendations for Program Improvement* (Dec. 10, 1984); Staff of the Subcommittee on National Security Economics of the Joint Economic Committee and the Investigative Staff of Senator Charles Grassley, *The Black Market in Department of Defense Classified Materials* (Dec. 21, 1988).

Among the excerpts from these documents that Fowler asserts the court erroneously excluded are the following:

> Senator Levin: [A] review of the services' policies and regulations reveals a system of rules and regulations that are highly complex, confusing, unclear, and occasionally misunderstood even by the officials responsible for administering them.

Levin Report at 3. (JA 82)

> Senator Levin: When honest people do not know whether or not they are entitled to get Mission Need Statements, whether or not they are entitled to get acquisition plans, whether or not they are entitled to get POMs or pieces of POMs or advance pieces of POMs, or what-have-you—honest people. When you have got defense contractors who say, "You are not worth a damn if you

don't have a POM"—that is not a dishonest defense contractor, by the way; that is not a criminal. That is an honest defense contractor who says you are not worth a damn if you don't have a POM.

Levin Report at 57. (JA 98) (A POM is a Program Objective Memorandum. Many of the documents specified in the indictment are POMs.)

Fowler also assigns error to the exclusion of the following excerpt:

Senator Cohen: [T]here is now a disturbing amount of disagreement and uncertainty throughout the defense industry and even among the Navy, Army, and Air Force themselves over whether certain types of documents should be disclosed.

Levin Report at 8. (JA 84) Fowler also cites excerpts from the other documents depicting confusion among the military and contractors.

The excerpts that Fowler sought to introduce cannot be viewed in isolation. They must be considered in the context of the entire report. For example, immediately before Senator Levin's reference to honest contractors, on which Fowler relies, the Senator said:

We are talking here about honest people. We are not talking about dishonest people. That is going to have to be taken care of in some other setting—that is a Justice Department setting, that is a courtroom setting, a criminal courtroom. We are talking about honest people.

Levin Report at 57. (JA 98) Again, immediately before the quotation from Senator Cohen that Fowler emphasizes, the Senator stated:

I certainly recognize that not all disclosure decisions can be purely black or white. The question of whether to disclose a certain document involves balancing the many needs of the Government, such as national security concerns and the need to protect the internal decision-making process of the executive branch, with the need to disclose as much information as necessary to a contractor in order to allow them to meet the Government's needs.

Levin Report at 8. (JA 94)

The reports that Fowler excerpted did not deal only with confusion. They contained information about bootlegging of the Defense Department's classified documents and discussed allegations of a consultant's bribery of a Pentagon employee in return for classified information. (JA 149) The reports decry an unfair procurement system that provides an opportunity for favored firms to the detriment of smaller, less well-connected companies that also want to compete on contracts. (JA 84) *The Black Market in Department of Defense Classified Materials* reports that the Department investigated 33 defense contractors and referred 4 of them, including Boeing, to the United States Attorney for the Eastern District of Virginia for possible prosecution. (JA 151)

In sum, the reports depict a procurement system flawed by confusion and corruption in the dissemination of classified documents. If Fowler were entitled to emphasize the confusion in the system, the government would be entitled to complete the picture by showing corruption. Possibly some of the reports could be redacted, but only at the expense of skewing what they actually disclose.

Fowler mistakenly relies on Fed.R.Evid. 803(8)(C) for admission of the reports. Rule 803 simply provides that such reports are not excluded by the hearsay rule. Admissibility is determined by the rules dealing with relevancy, 402 and 403. The reports were not relevant to the issue of Fowler's state of mind, his intent. They did not assess Fowler's actions to determine whether he was confused. They did not discuss whether a person with Fowler's experience would be confused. The confusion and corruption of others had no tendency to prove whether Fowler was confused or corrupt. For this reason the reports did not satisfy the definition of relevancy in Rule 401.

Even if the reports were minimally relevant, their exclusion was not an abuse of the district court's discretion. Rule 403

permits the exclusion of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." It would unfairly prejudice the prosecution to admit only excerpts from the reports depicting vague regulations and confusion among the military and the contractors. The jury would be misled if it were denied the opportunity to consider those parts of the reports that disclosed that some contractors acquired some secret budgetary information through corruption, not confusion. The reports would obscure the issue of Fowler's guilt or innocence and mislead the jury in its quest to determine whether he was confused or culpable.

■ In a closely related issue, Fowler assigns error to the trial court's exclusion of the testimony of two expert witnesses. The witnesses would have testified that the regulations were confusing, vague, and uncertain, that Fowler's interpretation of them was "at least arguably correct," and there was room for potential confusion concerning the documents that Fowler converted. They would have testified that much of the material Fowler conveyed was available to the public. The defense proffered this testimony to show that Fowler lacked specific intent to violate the law. The experts proposed to base their opinions on their perceptions of confusion and on Fowler's actions and statements.

Rule 702 contemplates the admission of expert testimony to assist the jury in its determination of factual matters. Fed.R. Evid. 702; *see* 3 Weinstein and Berger, *Evidence* p. 702–34 (1990). Fowler never testified that he was confused and, consequently, he was never cross examined on his extra-judicial, exculpatory statements. The experts' proffered testimony differed little from the closing arguments of Fowler's counsel.

From all the evidence, including Fowler's actions, statements, and transactions with his coconspirators, the jury had to determine whether he was confused or culpable. From this evidence the jury could decide whether he acted with specific intent to violate the law. This inquiry is a factual issue that juries regularly decide, and they need no expert witnesses to speculate about a defendant's state of mind. The expert witnesses could not testify that Fowler was confused, not culpable. To the extent that the witnesses would have ventured an opinion that Fowler did not have the mental state constituting an element of the crime, specific intent, Rule 704(b) would have barred their testimony. Expert witnesses are not intended to fill the role of oath helpers of olden times. *See* Fed.R. Evid. 704 notes.

To buttress his contention that he lacked specific intent, Fowler relies on *United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974). This court reversed Critzer's conviction for evading taxes on income derived from a business conducted on land that was part of an Indian reservation. Critzer lacked specific intent to violate the law. The local superintendent of the Bureau of Indian Affairs advised her that the income was not taxable according to the Department of the Interior's interpretation of a tax exemption. We reasoned that a tax exemption of uncertain scope, as evidenced by the conflicting interpretations of the Internal Revenue Service and the Department of the Interior, could not serve as the predicate of a prosecution for income tax evasion. The requisite intent to willfully evade the law was missing. 498 F.2d at 1162.

Here, in contrast, no government agency disputed the position advanced by the Department of Defense and the Department of Justice that the conversion and unauthorized conveyance of the secret documents in issue violated § 641. Moreover, during all the years that Fowler obtained the documents, he never claimed to be confused. Fowler never turned to any Department of Defense official for advice on the legality of his actions.

Most of the other evidentiary rulings about which Fowler complains dealt with issues that the district court held were irrelevant. Relying primarily on *United States v. Zettl*, 889 F.2d 51 (4th Cir.1989), the district court excluded testimony about the irrelevant claims that Boeing needed to

know the contents of the documents; that contractors customarily obtained the documents—"the everybody-does-it" defense; the widespread dissemination of the budget documents; and the lack of any competitive advantage gained by Boeing. Nevertheless, the court admitted some evidence about these issues without objection. In closing argument, Fowler's counsel found the evidence sufficient for him to assert that Fowler had not harmed the government, that employees of Boeing and other contractors to whom Fowler conveyed the documents had "secret" security clearances, that the security rules were complex and confusing, that the exchange of these documents was a tradition in the industry, and that everybody was doing it.

Federal Rule of Evidence 103 provides: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...." The district court's rulings did not deprive Fowler of any substantial right, including the right to a fair trial. Throughout the trial the court did not abuse its discretion in its evidentiary rulings.

## VI

■ Fowler assigns error to the court's refusal to give two of the instructions he offered. Fowler tendered an instruction designated "Defendant's Theory of the Case." The first sentence states: "The defendant has offered evidence pertaining to the lack of any substantial evidence of either a conspiracy to defraud or to commit the substantive offenses of unlawful conversion, conveyance or mail fraud." It continues in the same vein for a page and threequarters recounting the evidence in the light most favorable to Fowler, and it ends with an admonition to "remember" the government's burden of proof beyond a reasonable doubt.

■ As the district court observed, the proposal was argumentative and better suited for defense counsel's closing argument. Although a district court must instruct the jury on the law pertaining to the theory of defense, it is not obligated to summarize the defendant's evidence. *See United States v. Barham*, 595 F.2d 231, 245 (5th Cir.1979). In its charge the district court adequately explained the law on which the defense rested. It also gave a proper burden of proof instruction. Its rejection of Fowler's argumentative "Theory of Case" instruction was not error.

■ Fowler also assigns error to the district court's refusal to grant an instruction that stated in pertinent part:

If the defendant acted on the basis of a good faith, but mistaken belief that he was acting consistent with the requirements of the law, then he could not have been acting with the specific intent to violate the law, or with the intent to defraud required for proof of conspiracy, unlawful conveyance or conversion and mail fraud.

It concluded with the statement that if the jury believed that evidence of good faith created a reasonable doubt as to the intent element of any offense, the jury should acquit Fowler. The government does not argue that the proposed instruction is wrong. It asserts that a separate good faith instruction was unnecessary and that the court's instructions adequately explained to the jury the law pertaining to Fowler's defenses.

The definitive case construing § 641 is *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), in which the Court held that intent is an essential element of the crimes the statute denounced. 342 U.S. at 263, 72 S.Ct. at 249. Although *Morissette* dealt only with a charge of conversion in violation of § 641, the district court properly applied the Court's construction of the statute to the other crimes charged in Fowler's indictment. The district court complied with *Morissette* by fully instructing the jury on the government's burden to prove specific intent. The Court explained:

An act is done wilfully, and that is an element of each of the offenses, both the conspiracy and the substantive offenses, if it is done voluntarily and intentionally and with a specific intent to do some-

thing the law forbids, that is with a purpose to disobey or disregard the law.... An act is done knowingly, which is also an element of each of the substantive offenses as well as the conspiracy offense, if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

(JA 915)

*Morissette* does not require a good faith instruction such as the one Fowler sought. In *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976), the Court held that a similar instruction on willfulness was adequate and stated: "An additional instruction on good faith was unnecessary." 429 U.S. at 13, 97 S.Ct. at 24; *see also Cheek v. United States,* — U.S. ——, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991). There is no principled reason why the Court's observation in *Pomponio*, a tax case, should not apply in this case. Other courts do not require a separate instruction on a good faith defense if the district court gives adequate instructions on specific intent. *See, e.g., United States v. Green*, 745 F.2d 1205, 1209 (9th Cir. 1984); *United States v. McGuire*, 744 F.2d 1197, 1201–02 (6th Cir.1984); *United States v. Gambler*, 662 F.2d 834, 837 (D.C.Cir. 1981). *But see United States v. Harting*, 879 F.2d 765, 767–69 (10th Cir.1989). The district court did not err by declining to give Fowler's separate instruction on good faith.

### VII

 Fowler assigns error to the following instruction:

It is not enough however for the Government to prove that the conveyance was without authority. The Government must also prove that the defendant either knew that he was conveying the document without authority or acted with reckless disregard as to whether he had authority.

(JA 922) Fowler equates "recklessness" with "carelessness" and claims the jury was allowed to convict him for negligence. Fowler protests that, although the "reckless disregard" instruction might be proper

if given with an instruction on "conscious avoidance," the court erroneously interspersed its discussion of these concepts with other instructions.

We review an entire charge to determine whether the court adequately instructed the jury on the elements of the offense and the accused's defenses. *United State v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975). The court never equated "recklessness" with "carelessness." On the contrary, it specifically told the jury that Fowler could not be convicted because of negligence, explaining:

The word knowingly is added to insure that no one will be convicted because of some mistake or accident or other innocent reason on the part of the defendant.

You may infer that a defendant acted knowingly if you conclude that a defendant had a conscious purpose as opposed to negligence or mistake to avoid learning an existing fact. If you find that the defendant did not learn about the true nature of an existing fact and that the only reason he did not learn it was because he deliberately chose not to learn it for the very purpose of being able to assert ignorance at a later time. Then you may infer and find that he had the full equivalent of knowledge because one's self-imposed ignorance cannot protect him from criminal liability. However, that you may infer such knowledge does not require you to.

(JA 925–26). We approved the concepts of reckless disregard and conscious avoidance in *United States v. Biggs*, 761 F.2d 184, 188 (4th Cir.1985), and explained that an instruction on reckless disregard alone might be insufficient. It is proper, however, when the court also instructs on conscious avoidance. Although the district court did not combine these principles in one instruction, as in *Biggs*, the instructions satisfied *Biggs*'s rationale. The sequence in which the court gave the instructions was not error.

 Fowler assigns error to the instruction on conscious avoidance, alleging that the evidence was insufficient to support it. He failed to voice this objection at

trial, and he has failed to prove plain error within the meaning of Fed.R.Crim.P. 52. There was ample evidence to support the instruction. To retain his security clearance, Fowler acknowledged on several occasions that he knew the rules governing the dissemination of secret documents. At trial, however, he insisted the rules were vague and complex, but he introduced no evidence that he took any measures to dispel his proffered inability to understand them. The instruction on conscious avoidance was proper because Fowler based his defense largely on a lack of guilty knowledge. *See United States v. Cogdell*, 844 F.2d 179, 181 (4th Cir.1988).

█ Fowler also assigns error to the following instruction:

It is a defense to a charge of conveyance without authority that the defendant either had actual authority or that he believed he had authority and that this belief was reasonable under all of the circumstances.

(JA 924) Fowler contends that the instruction erroneously told the jury that his belief must be objectively reasonable. He relies primarily on *Cheek v. United States*, — U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In that case, the Court held it was error to give instructions that embodied a district court's ruling that "a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law, if it is to negate willfulness, must be objectively reasonable." 111 S.Ct. at 610.

*Cheek* does not require reversal. There the district court's erroneous ruling requiring objective good faith referred to Cheek's interpretation of the tax laws. In Fowler's case, however, the district court spoke of reasonable belief in quite a different context. The court addressed Fowler's belief in the existence of a fact—his authorization to convey the documents. Whether Fowler reasonably believed that he had such authorization depended on his knowledge of who provided the documents and his perception of the provider's authority to act. From Fowler's statements, actions, and transactions with coconspirators the jury

could decide whether Fowler reasonably believed that he had authority. The court did not expressly or impliedly instruct that Fowler's belief had to be objectively reasonable. When the court spoke of "all of the circumstances," it was referring to the factual circumstances under which Fowler obtained the documents and how he handled them afterwards.

Finally, we believe that the one word, "reasonable," in the context in which the district court spoke and in light of all the other instructions could not have misled the jury. If it was error, it was harmless. We cannot conclude that the "instruction by itself so infected the entire trial" that it deprived Fowler of a substantial right. *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *see* Fed.R.Crim.P. 52(a).

We find no cause for reversal in Fowler's assignments of error. The district court's judgment is affirmed.

AFFIRMED.