UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas D. McAUSLAND,
Defendant–Appellant,

The Washington Post; American Society of Newspaper Editors; The Newsletter Publishers Association, Incorporated; The Radio–Television News Directors Association; The Reporters Committee for Freedom of the Press; American Civil Liberties Union; The Newspaper Guild; The Electronic Industries Association; Washington Legal Foundation, Amici Curiae.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher M. PAFORT,
Defendant–Appellant,

The Washington Post; American Society of Newspaper Editors; The Newsletter Publishers Association, Incorporated; The Radio–Television News Directors Association; The Reporters Committee for Freedom of the Press; American Civil Liberties Union; The Newspaper Guild; The Electronic Industries Association; Washington Legal Foundation, Amici Curiae.

Nos. 91–5874, 91–5875.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1992.

Decided Aug. 14, 1992.

Amended by Order Oct. 27, 1992.

Andrew Lewis Frey, Mayer, Brown & Platt, Washington, D.C., argued (Dan M. Kahan, Mayer, Brown & Platt, Joseph P. Covington, Daniel Marino, Mary Beth Sullivan, Seyfarth, Shaw, Fairweather & Geraldson, Mark H. Touhey, III, Arthur G. Wyatt, Reed, Smith, Shaw & McClay, on brief), for defendant-appellant.

Jack I. Hanly, Asst. U.S. Atty., Alexandria, Va., argued (Richard Cullen, U.S. Atty., Joseph J. Aronica, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Kevin T. Baine, Victoria L. Radd, Ari S. Zymelman, Williams & Connolly, Washington, D.C., for amici curiae, The Washington Post, American Soc. of Newspaper Editors, Newsletter Publishers Ass'n, Radio–Television News Directors Ass'n, and Reporters Committee for Freedom of the Press.

Mark H. Lynch, David H. Remes, Stanlake J.T.M. Samkange, Covington & Burling, Kate Martin, American Civ. Liberties Union Foundation, Washington, D.C., for amici curiae, American Civ. Liberties Union and Newspaper Guild.

John J. Kelley, Electronic Industries Ass'n, Washington, D.C., for amicus curiae, Electronic Industries Ass'n.

Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, D.C., for amicus curiae, Washington Legal Foundation.

Before HALL and WILLIAMS, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

GLEN M. WILLIAMS, Senior District Judge:

Thomas D. McAusland ("McAusland") and Christopher M. Pafort ("Pafort") appeal their convictions of one count of conspiracy to defraud the United States and to commit substantive offenses under 18 U.S.C. § 371, one count of conversion or unauthorized conveyance of government property under 18 U.S.C. § 641, and four counts of wire fraud under 18 U.S.C. § 1343. We affirm.

### I.

In 1987, McAusland and Pafort were marketing executives employed by Litton Data Systems, Inc. ("Litton"). McAusland was vice-president of marketing or business development, and Pafort was a director of business development. Both McAusland and Pafort's duties included trying to obtain new business for Litton from the United States Department of Defense ("DoD"). In carrying out these duties, McAusland and Pafort had contact with Thomas Muldoon ("Muldoon"), a private consultant hired by Litton to identify new business opportunities and to develop information on ongoing procurements. Between June, 1987 and June, 1988, Litton paid Muldoon $96,000 for his consulting services.

A brief overview of the government's procurement procedure is helpful for a full understanding of the facts of this case. The procurement process is conducted within the framework established by the Federal Acquisition Regulations ("FARs"). The process begins when the government designs a program to meet a national defense need.

The contracting agency then issues a request for proposals ("RFP"). 48 C.F.R. § 15.402 (1991). Once the proposals are submitted, the agency performs its initial evaluation, with the cost and technical components being evaluated separately. These reviews are then combined and evaluated by the contracting officer or by an advisory team.

This initial evaluation determines the "competitive range" for the procurement. This range consists of the proposals "that have a reasonable chance of being selected for award." *Id.* § 15.609(a). Proposals which do not fall within this range are no longer considered. Once this initial evaluation is complete, the agency may enter into

formal discussions with the remaining competitors. These remaining competitors are then invited to submit their "best and final offers". ("BAFOs"). *Id.* § 15.611. The source selection authority then decides to whom the contract will be awarded based on the recommendations of the contracting officer or advisory team.

This case involves the efforts of McAusland and Pafort to obtain procurement information between March, 1987 and June, 1988.[1] During this time, McAusland and Pafort received information from Muldoon concerning three procurements: (1) the Advanced Tactical Air Command Central ("ATACC"), a procurement for radar command and ground control system conducted by the Space and Naval Warfare Systems Command ("SPAWAR"); (2) UYQ–21, a procurement for a radar display system conducted by Naval Sea Systems Command ("NAVSEA"); and (3) Fiber Optics Cable System ("FOCS"), a procurement conducted by SPAWAR, to obtain a source for a Marine Corps fiber optic communications system.

## 1. ATACC

On April 30, 1987, SPAWAR issued the RFP on ATACC. The RFP stated that any proposals would be evaluated in four areas based on a weighted average. However, the RFP did not list the weights government evaluators would assign to each area.

Pafort was directly responsible for preparing Litton's proposal on ATACC. On July 28, 1987, Pafort spoke to Muldoon about the ATACC procurement and asked Muldoon for any information he could obtain concerning the procurement. Pafort advised Muldoon that Litton's strategy was to submit an initial bid that, while not meant to be the lowest bid, would be low enough to include Litton in the "competitive range."

Ultimately, Muldoon provided McAusland with the evaluation weights that the government would use in judging bids on ATACC. Muldoon obtained this information from Mark Saunders ("Saunders"), another private consultant, who had received the information from George Stone ("Stone"), the SPAWAR official responsible for conducting the ATACC procurement. Muldoon paid Saunders for this information.

On August 17, 1987, McAusland informed Muldoon that Litton was ready to submit its ATACC proposal. They agreed that Muldoon should not attempt to obtain copies of all the competitor's technical proposals. McAusland stated that to do so would be "playing with fire." The two agreed to wait until after the government had examined the initial proposals to determine whether Muldoon needed to obtain a particular competitor's proposal.

Muldoon told Pafort about McAusland's decision not to obtain copies of all the technical proposals. Muldoon stated that he would not obtain a competitor's proposal unless a proposal contained a design that Litton would want to "steal."

On August 21, 1987, Pafort asked Muldoon how soon he would have the information about the competitors' bids. Later, McAusland told Muldoon that Muldoon could sell the information to another competitor if Litton did not have a chance of getting the contract.

On September 24, 1987, Saunders told Muldoon that he did not expect to obtain any information on ATACC in the near future. However, Saunders stated he might be able to learn where Litton stood in comparison with the other companies. Muldoon then told Pafort that he had asked his source to find out where Litton stood. Muldoon said that if he obtained this information, Pafort should come to Washington rather than discussing it on the telephone. Pafort agreed.

On September 29, Stone told Saunders what each competitor in the ATACC procurement had bid. Stone also told Saunders that Litton's bid had been the highest and was not in the competitive range.

Saunders then told Muldoon that Litton had submitted the highest bid and told Muldoon the price Stone had quoted as being Litton's. Saunders also told Muldoon that

---

**1.** The conduct giving rise to the convictions occurred prior to the passage of the Office of Federal Procurement Policy Act. 41 U.S.C.A. § 423 (West Supp.1992).

Litton would be eliminated before the next stage of the competition.

On October 1, 1987, Muldoon gave this information to McAusland. McAusland verified that Muldoon had accurately reported Litton's bid and agreed that Muldoon's other information was probably correct. Muldoon advised McAusland not to send a letter withdrawing Litton's bid because Litton was not supposed to know that it would be eliminated. McAusland agreed.

Between October and March, 1988, SPAWAR continued the evaluation process of the initial ATACC proposals. During this period, Pafort asked Muldoon for the latest information on ATACC. Pafort said he was interested because Litton had invested $1 million in its ATACC effort. In February, Pafort said he would like to see the ranking of the competitors, which Muldoon indicated he had obtained from his source. Muldoon had obtained them from Saunders who had, in turn, obtained them from Stone.

SPAWAR officials concluded their evaluation process in February, 1988. In March, 1988, they notified four companies that they were in the competitive range and would continue in the competition, while advising Litton and others that they were being eliminated. The contract was ultimately awarded to Grumman Systems for approximately $95 million.

### 2. UYQ–21

In June, 1987, Litton, Raytheon and SAIC submitted bids to NAVSEA for the UYQ–21 contract. On August 19 and 20, 1987, government officials gave final approval to the evaluators' recommendation to award the contract to Raytheon without requesting any BAFOs. Prior to these final approvals, McAusland and Pafort spoke to Muldoon about the procurement on several occasions.

Muldoon knew Jerry Manning ("Manning"), who was on the government cost review team evaluating the proposals. Muldoon told Manning that Litton had obtained copies of all the competitors' proposals. Muldoon showed Manning a list of dollar amounts, which Manning confirmed as being the figures from each of the UYQ–21 price proposals. On July 29, 1987, Manning also told Muldoon that Litton would have to revise its cost proposal if the company was going to win the contract at the BAFO stage.

On July 29, 1987, Muldoon told McAusland that Muldoon had copies of the government's evaluations of the UYQ–21 price proposals. McAusland telephoned George Miller, another Litton executive, and told Miller he would bring the pricing evaluations to Litton's offices.

On July 31, 1987, Muldoon advised McAusland that Muldoon had left a document at Litton's Virginia office that "looked good." McAusland said that he had instructed a secretary to send the document to him via express mail. Muldoon also referred to information contained in the document, which corresponded to information contained in the government's Source Selection Plan for the UYQ–21 procurement. Manning had given this document to Muldoon.

In August, 1987, Muldoon told McAusland and Pafort that the Navy would probably award the contract without requesting BAFOs. Muldoon told Pafort and McAusland that, after the initial evaluations, Litton was second behind Raytheon in the bidding. Muldoon learned this from Manning.

In July and August, 1987, Muldoon also told McAusland that Muldoon had a contact, identified as a government official, who could ensure a request for BAFOs on the UYQ–21 if Litton came up with some money. McAusland asked if Litton could win the contract if the Navy asked for BAFOs. Muldoon advised McAusland that Raytheon had ranked substantially better in the initial evaluation. McAusland asked if Muldoon could obtain the technical evaluations before Litton would have to submit its BAFO. Muldoon did not think that he could. McAusland then indicated that he did not want to pursue this course of action. The Navy awarded the contract to Raytheon for approximately $47 million.

### 3. FOCS

In December, 1987, Muldoon provided McAusland with a copy of the draft of the

government's Acquisition Plan for the procurement. In early 1988, Pafort told Muldoon that Litton was interested in the program and asked Muldoon to check on the proposed date the government was going to issue a RFP on the project. Subsequently, when the RFP was released, Litton did not submit an offer on the FOCS plan.

Defendants also challenge the trial court's denial of their motion for a mistrial. On June 14, 1991, while Defendants' trial was in progress, the government issued a press release concerning the guilty plea of former Assistant Secretary of the Navy, Melvin Paisley ("Paisley").

Paisley pled guilty as a result of a fraud investigation known as "Operation Ill Wind" which involved bid rigging and government contracts. News stories concerning the plea appeared on that evening's television news and in the newspaper the following day. Defendants moved for a mistrial based on the publicity. The district court questioned the jury concerning the Paisley plea. Although members of the jury had seen the television news and newspaper article, each juror stated he or she could render an impartial decision. The district court then permitted the trial to continue.

## II.

◼ Section 641 punishes an individual who "embezzles, steals, purloins, or knowingly converts to his use or the use of another, or *without authority,* sells, conveys or disposes of any record, voucher, money or thing of value [2] of the United States...." 18 U.S.C. § 641 (emphasis added). Defendants contend that, standing alone, the phrase "without authority" is devoid of meaning and that it must derive its meaning from "other, more particular, prohibitions against disclosure" established by "federal statutes [or] administrative rules and regulations." *United States v. Lambert,* 446 F.Supp. 890, 899 (D.Conn. 1978), *aff'd sub nom. United States v. Girard,* 601 F.2d 69 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

Specifically, Defendants contend that they can be convicted of information theft under section 641 only if disclosure of the information was clearly prohibited by published FARs. Defendants assert that, without specific FARs prohibiting disclosure, section 641 violates the Due Process Clause as applied to the conduct at issue because the statute is unconstitutionally vague. Defendants assert that this same argument prohibits their convictions under sections 371 and 1343. We disagree.

Defendants cite two primary cases for the proposition that they can be convicted under section 641 only if disclosure of the information was prohibited by specific published regulations: *United States v. Girard,* 601 F.2d 69 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), and *United States v. Morison,* 844 F.2d 1057 (4th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988). Labelling their argument as the *"Girard–Morison"* rule, Defendants assert that the case was prosecuted under a legally defective theory.

In *Girard,* defendants were convicted under section 641 of selling the names of Drug Enforcement Agency ("DEA") informants obtained from the DEA's computerized files. Defendants challenged their convictions on the ground that section 641 was vague and overbroad. *Girard,* 601 F.2d at 71. The court concluded that the defendants must have known that the sale of this information was prohibited. The court noted that the DEA's own rules and regulations forbid such disclosure. The court stated that these rules *"may* be considered as both a delimitation and a clarification of the conduct proscribed" under section 641. *Id.* (emphasis added). Therefore, the court concluded that section 641 was not vague or overbroad as applied to the defendants. *Id.* at 71–72.

In *Morison,* defendant was convicted under the Espionage Act, 18 U.S.C. § 793(d) and (e), for the unauthorized transmittal of certain satellite secured photographs of So-

---

**2.** This circuit has recognized that information, such as that involved in this case, is a "thing of value" under section 641. *United States v. Fowler,* 932 F.2d 306 (4th Cir.1991).

viet naval preparation to "one not entitled to receive them." [3] Defendant challenged his conviction under 18 U.S.C. § 793(d) and (e) on the grounds that the statute was vague and overbroad. However, the court found that the defendant was familiar with the regulations governing disclosure of the information. The court followed *Girard* and stated that the statutes *"can* be limited and clarified by the Classification Regulations and, so limited and clarified, are not vague." *Morison,* 844 F.2d at 1075 (emphasis added).

We do not read these decisions as requiring the disclosure to be specifically proscribed by published regulations. While we agree that the existence of a published regulation proscribing disclosure certainly prevents the statute from being vague as applied, we do not believe it is the exclusive method of preventing vagueness. *See United States v. Jones,* 677 F.Supp. 238, 241 (S.D.N.Y.1988) (knowledge of lack of authority shown through defendant's knowledge of the "government's long-standing practice" of confidentiality). Thus, we hold that the disclosure of the procurement information need not have been proscribed by published FARs in order to prevent section 641 from being vague as applied.

Defendants concede that, if the Court rejects the *Girard–Morison* rule, their remaining arguments on this issue will similarly fall. We agree and address their remaining points briefly.

Defendants assert that rejection of the *Girard–Morison* theory renders section 641 vague as applied to the conduct at issue. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and provide "explicit standards for those that apply them." *Grayned v. City of Rockford,* 408 U.S. 104,

108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Here, Defendants assert that section 641 is vague as applied rather than vague on its face. Such a challenge "must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975).

The government has cited several categories of evidence to show that disclosure was without authority and that Defendants knew as much. The government cites published regulations which were in effect at the time of the relevant conduct and prohibited disclosure of information in the proposals. 48 C.F.R. §§ 15.413–1(a), 15.610(d), 15.612(e) (1987). The government also cites unpublished DoD regulations, which are available through the Freedom of Information Act, that forbid disclosure. DoD Directive 4105.62(E)(3)(c).[4] Many of the documents obtained by Litton contained legends restricting disclosure, which a panel of this Court recently found relevant in considering whether an individual had fair notice that his conduct was proscribed by law. *United States v. Caso,* 935 F.2d 1288 (4th Cir.1991) (unpublished). Defendants' behavior and conduct also indicated that they knew the disclosure was without authority. For example, McAusland agreed that he should not write a letter withdrawing Litton's ATACC bid because he was not supposed to know where Litton stood in the competition. He also agreed that having Muldoon get all of the ATACC competitors bids would be "playing with fire." Pafort agreed to travel to meet Muldoon in order to avoid discussing certain information over the phone. At trial, Pafort testified that he would not ask for rankings and technical evaluations of competitors because that "was not the correct thing to do." This is a relevant consideration. *Id.*

---

**3.** Defendant was also convicted under section 641. However, the court did not address whether this section was vague as applied to the defendant.

**4.** This provides:

To ensure fairness in the source selection process, evaluation criteria and their relative importance must flow from the statement of

work and must be furnished to all potential offerors in the solicitation. The relative importance of the evaluation criteria will be indicated in the solicitation. However, when numerical weights are applied by the SSA or SSAC [ (Source Selection Advisory Counsel) ], such weights will not be disclosed either to offerors or to evaluators other than the SSAC, to preclude intentional or unintentional bias in proposals or evaluations.

Stone and Manning testified to their lack of authority to disclose the information. Other procurement officials testified that Defendants, in light of their experience and positions, would have known that the information was not to be disclosed.[5]

In light of the above, we hold that the statute was not unconstitutionally vague as applied to Defendants' behavior. Also, we hold that "in view of the statute's plainly legitimate sweep in regulating conduct, it is not so substantially overbroad that any overbreadth that may exist cannot be cured on a case by case basis." *Girard,* 601 F.2d at 72; *see also United States v. Jeter,* 775 F.2d 670, 682 (6th Cir.1985), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986) (rejecting claim that section 641 was overbroad).

Defendants also challenge the district court's jury instructions. Defendants claim the trial court erred in refusing to give an instruction: (1) requiring the jury to find that Defendants "knew that the information ... was released without authority in violation of [federal acquisition] regulations" (App. at 167); and (2) concerning Defendants' receipt of the determination that Litton's ATACC proposal was unacceptable (App. at 168). When considering a challenge to jury instructions, the inquiry on appeal is limited to "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991). The validity of both these instructions hinges on the Court's acceptance of the *"Girard–Morison"* rule. Since we have declined to accept this rule, these arguments must similarly fall.

### III.

Defendants assert that the district court erred in denying their motions for mistrial based on the publicity surrounding the Paisley plea. The threshold question in addressing a claim of in-trial publicity "is whether the publicity rises to the level of substantial prejudicial materi-

al." *United States v. Jones,* 542 F.2d 186, 194 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). If the publicity rises to this level, the court must "ascertain the extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial." *United States v. Hankish,* 502 F.2d 71, 77 (4th Cir.1974). If the publicity does not reach this level, the court need not take the precautions mandated by *Hankish,* including granting a mistrial. *Jones,* 542 F.2d at 194.

Here, the publicity was not substantially prejudicial. "Information is prejudicial if it is substantially adverse to the defendant, has not been presented to the trial jury in court and is not properly admissible in the trial." *United States v. Gray,* 788 F.2d 1031, 1033 (4th Cir.1986). Defendants have failed to meet this standard. Paisley was not a co-defendant, nor was he involved in any of the acts charged against Defendants. Therefore, the court did not err in denying the mistrial.

### IV.

Defendants assert that the district court erred in denying their motion *in limine* to exclude evidence of the guilty pleas and plea agreements of the two procurement officials who disclosed the information specified in the indictment from the prosecution's case-in-chief. However, we find that this issue is controlled by *United States v. Henderson,* 717 F.2d 135, 137 (4th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984), and affirm the district court's decision.

### V.

For the foregoing reasons, we find that the district court committed no error. We therefore affirm.

AFFIRMED.

---

**5.** This testimony was proper as held by this court in *Fowler,* 932 F.2d at 312.